UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

TENLEY MCLAUGHLIN GOOD,

              Plaintiff,                              Case No. 18-11260

v.                                                    Honorable Thomas L. Ludington

BIOLIFE PLASMA SERVICES, L.P.;
and SHIRE PHARMACEUTICALS aka
SHIRE US, INC.,

              Defendants.
_____/

**OPINION AND ORDER DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DIRECTING SUPPLEMENTAL BRIEFING**

Plaintiff, Tenley McLaughlin Good filed a complaint in Isabella County Circuit Court alleging claims for malpractice and ordinary negligence by Defendants, Biolife Plasma Services and Shire Pharmaceuticals. ECF No. 1 at PageID.1, 11-12. Plaintiff passed out and was injured when an employee of Defendants took a capillary sample from Plaintiff's finger in anticipation of Plaintiff making a blood plasma donation. Defendants removed the case to federal court based on diversity jurisdiction. ECF No. 1 at PageID.2. The parties submitted a joint stipulation dismissing Plaintiff's medical malpractice claim on August 20, 2019. ECF No. 35. Plaintiff's general negligence claim identified two different theories of Defendants' breach of duty. She alleged that Defendants failed to "take an adequate history to disclose Plaintiff's history of fainting during blood draws" and, in addition, that Defendants failed to "position her in a safe chair or cot/gurney, with protective restraining components." ECF No. 1 at PageID.12. For purposes of clarity the first theory will be referred to hereinafter as the "negligent history" theory and the latter the "negligent positioning" theory.

On August 14, 2019, Defendants filed a motion for summary judgment primarily focused on the negligent positioning theory. Defendants contend that Plaintiff's negligent positioning claim is governed by the Michigan law of premises liability and the associated open and obvious doctrine. Defendants contend that the negligent history theory is bared by the doctrine of assumed risk. ECF No. 32. On August 23, 2019, Plaintiff filed a cross-motion for partial summary judgment primarily arguing that Defendants had admitted each of the elements of the negligent history claim. ECF No. 37. All of the parties filed responses to the cross-motions for summary judgment. ECF Nos. 46, 49. Replies followed. ECF Nos. 52, 53.

Defendants motion for summary judgment of Plaintiff's negligent positioning claim will be denied for reasons explained in this opinion. In summary, Michigan's law of premises liability and the associated doctrine of open and obvious dangers do not apply to Plaintiff's negligent positioning theory. In addition, Michigan's law of assumed risk does not apply and does not bar Plaintiff's negligent history claim. Supplemental briefing will be directed however to clarify a number of additional questions.

First, as earlier noted, Plaintiff's complaint identified two different theories of Defendants liability. Plaintiff's dispositive motion, however, focused nearly exclusively on her negligent history theory and appears to be abandoning the negligent positioning theory of liability. Plaintiff will be directed to either affirm that she intends to prosecute the negligent positioning theory or clarify her intent to pursue the negligent history theory alone.

Second, because the parties' papers address the two theories in different contexts, they lack focused attention to the elements of the negligence claim(s). That is, duty (does the law require Defendants to conform to a particular standard of care), breach of duty (what is the evidence that Defendants did not conform to the standard of care), and proximate cause (is the connection

between the negligent conduct sufficiently foreseeable to warrant the imposition of liability). Accordingly, both parties will be directed to supplement their briefs by no more than 15 pages once Plaintiff has affirmed or withdrawn her negligent positioning theory of liability. Each will be entitled to a response not to exceed five pages.

Finally, to be addressed in the supplemental briefs is Michigan's law of comparative negligence and the application of Michigan's tort reform to their dispositive motions. *See* MCL § 600.2959; *Blackwell v. Franchi*, 914 N.W.2d 900 (Mich. 2018).[1]

**I.**

Tenley McLaughlin Good grew up with a tendency to get light-headed and/or faint when she saw blood. When Tenley was seven or eight, she cut her hand on glass and had a negative reaction to seeing the blood. ECF No. 32-5 at PageID.2162. Tenley once fainted when her father cut the family's dog's nails too short and caused the dog to bleed. ECF No. 32-4 at PageID.2159. Tenley became very pale and unstable. *Id.* Tenley also became dizzy after she had her ears pierced. ECF No. 32-5 at PageID.2163. When Tenley was in junior high, Tenley's sister sliced her hand in the kitchen and Tenley passed out from observing the blood. ECF No. 53-2 at PageID.6543.

Despite her struggles with the sight of blood, Tenley "had always donated blood [because] it was a big deal to her." ECF No. 32-5 at PageID.2164. In high school, Tenley and her friend

---

[1] Michigan's comparative negligence statute provides "In an action based on tort or another legal theory seeking damages for personal injury . . . the court shall reduce the damages by the percentage of comparative fault of the person upon whose injury . . . the damages are based . . . . If that person's percentage of fault is greater than the aggregate fault of the other person or persons . . . the court shall reduce economic damages by the percentage of comparative fault of the person upon whose injury . . . the damages are based . . . and noneconomic damages shall not be awarded." MCL § 600.2959 (2019). The Michigan Supreme Court explained that "[t]he Legislature, by requiring that a plaintiff's recovery be reduced by the percentage of her own negligence, mandated that a plaintiff's negligence could not be used as a basis to dismiss a suit altogether." *Blackwell v. Franchi*, 914 N.W.2d 900, 903 (Mich. 2018). In a footnote, the Court further explained that "Michigan is (mostly) a pure comparative negligence jurisdiction. That is, even if a plaintiff is 99% at fault, she can still recover 1% damages. The one exception to this is for non-economic damages . . . which are barred whenever the plaintiff is more at fault than anyone else." *Id.* at n.2.

"were racing for their gallon tag because . . . it saves lives." *Id.* In 2011 when Tenley was about 16, she tried to donate blood at a MI Blood donation center for the first time. ECF No. 32-5 at PageID.2162; ECF No. 32-3 at PageID.2152. She fainted after her finger was pricked for a capillary sample so she could not donate blood. ECF No. 32-5 at PageID.2162; ECF No. 32-3 at PageID.2152. On June 7, 2012, she tried to donate blood again. Tenley had no observable reaction when the capillary sample was taken, but passed out when the bag began filling with blood. ECF No. 32-3 at PageID.2152. On another occasion, according to Tenley's mother, she attempted to donate blood at an ice rink in Gladwin and later became dizzy. ECF No. 32-5 at PageID.2163. As a result of her difficulty donating blood, MI Blood noted in her chart that she had to be supine when donating. ECF No. 32-5 at PageID.2162.

## A.

Biolife Plasma has a procedure for addressing new plasma donors. Katie Pietrzak, the Center Director, and Amy Parks, an RN, testified about the procedures included for plasma donors. The process begins with a customer's check-in with the receptionist and medical historian, followed by a check for an adequate donation vein by a phlebotomist, a capillary sample taken by a medical historian, and finally a health questionnaire and physical exam with a nurse. ECF No. 32-2 at PageID.2144; ECF No. 49-9 at PageID.5962. Each step of the process helps determine whether the donor meets the criteria to donate plasma. ECF No. 32-2 at PageID.2142. A repeat donor has a shorter process that proceeds in a different order. *Id.* at PageID.2144-2145.

The receptionist obtains the donor's identification, social security card, and address. ECF No. 53-3 at PageID.6550. Next, the receptionist or a medical historian completes a new donor chart, determines if the potential donor is on the unacceptable address list or a NDDR list (a list if a potential donor was declined at another facility), takes the donor's picture, and has the donor

read the consent to take blood out loud. The donor must then "sign" the consent by digitally scanning their fingerprint. ECF No. 53-3; ECF No. 49-9 at PageID.5962. The consent statement provides:

> I voluntarily consent to the withdrawal of my blood for the purpose of laboratory testing. It is understood that the blood is to be used solely for the purpose of testing for donor eligibility. I understand that this consent will remain in effect as long as I am a plasmapheresis donor and that I am free to withdraw from the program at any time. ECF No. 53-4 at PageID.6553.

The phlebotomist then completes a vein check of the potential donor and inquires if the donor has donated blood or plasma before and if so, if the donor suffered an adverse reaction. ECF No. 32-2 at PageID.2413; ECF No. 32-6 at PageID.2168. The phlebotomist initials and dates the Donor Identification Form ("DIF") after completing the vein check. ECF No. 53-5 at PageID.6556-6557. The DIF does not have a specific question about whether the donor has had a reaction to past donations. ECF No. 32-2 at PageID.2143.

If the donor communicates to the phlebotomist or anyone else during the donor screening process that they have had adverse reactions to donating blood or plasma in the past, the screening process stops and the donor is sent to the nurse. ECF No. 32-6 at PageID.2168. If the donor does not disclose an adverse donation history, the medical historian obtains a capillary sample by pricking the donor's finger with a lancet to measure the protein levels in the donor's blood.[2] ECF No. 46-11 at PageID.5212; ECF No. 46-8 at PageID.5025. They "take a cleaning swab, a wipe and clean the finger and then [they] poke the blood and then [they] squeeze" the finger and collect the blood. ECF No. 32-8 at PageID.2174. The medical historian talks with donors throughout the process. ECF No. 32-8 at PageID.2175. Medical historians are trained to inform donors that a capillary sample will be taken, but not to inform the customer of the timing of the finger prick

---

[2] The parties do not clearly explain the purpose of the capillary sample. It is unclear if the sample is used for more than checking protein levels.

procedure. ECF No. 49-8 at PageID.5958. If the donor has an adverse reaction during the procedure, medical historians are trained to hold the donors hands and call for a nurse. ECF No. 49-9 at PageID.5963. A nurse who works at Biolife testified that it is rare, but that she has seen donors get lightheaded or dizzy at Biolife during the capillary sample procedure. ECF No. 49-9 at PageID.5963. After the capillary sample, the donor meets with the nurse for a physical evaluation and is asked to complete a health history questionnaire, which includes questions about the donor's donation history. ECF No. 49-9 at PageID.5963.

**B.**

In September or October 2015 one of Plaintiff's classmates at CMU approached her about donating plasma at Biolife Plasma in Mount Pleasant, Michigan. ECF No. 32-3 at PageID.2154. Plaintiff did not do any research about Biolife or the plasma donation process. ECF No. 32-3 at PageID.2154. She was aware that giving plasma takes longer than giving blood and that there would be a needle in her arm. ECF No. 32-3 at PageID.2154. The night before Plaintiff arrived at Biolife, she stopped by her parents' home and told her mother that she was going to donate plasma. ECF No. 32-5 at PageID.2164. Plaintiff's mother told her "Well, make sure they know that you're not great with that" and Plaintiff responded "They'll take care of me just like Michigan Blood. They'll take care of me. Mom, you worry too much, they know what they're doing." *Id.* Plaintiff's mother works in the healthcare field and they "talk[ed] about like some of the products they make" with donated plasma and how "it helps hemophiliac kids." *Id.* They also talked about how important plasma donation is to emergency medicine but did not discuss the "nitty-gritty specifics of the mechanical nature" of donation. *Id.* Plaintiff's mother also testified that she knew Plaintiff would be paid for donating plasma, as would her classmate. *Id.*

On October 8, 2015, Plaintiff arrived at Biolife Plasma for the first time to donate plasma. ECF No. 32-3 at PageID.2154. Plaintiff approached the reception desk when she arrived and was asked to fill out a form, provide identification, and scan her fingerprint. *Id.* at PageID.2155. Usually the receptionist checks in the donor and the medical historian verifies the donor's ID, proof of address, and consent to take their blood. ECF No. 49-9 at PageID.5962. It is unclear from the deposition testimony if the duties were divided between a receptionist and a medical historian in Plaintiff's case, but it is clear that she successfully proceeded through the registration process.

Plaintiff testified that the phlebotomist who performed the capillary sample procedure called her back, told her to have a seat, asked for her hand, and then pricked her finger. ECF No. 32-3 at PageID.2155-2156. She has no memory of the vein check procedure being performed or the question about prior problems with blood donation procedures but acknowledges that her "memory at that moment is not great" and "it may have" happened. ECF No. 32-3 at PageID.2156. Plaintiff's DIF is initialed by Julida Griffin Reeves. ECF No. 53-4 at PageID.6553. Ms. Reeves testified that she performed the vein check on Plaintiff because she recognizes her writing where she initialed and dated Plaintiff's DIF indicating she performed the vein check. ECF No. 32-9 at PageID.2179. Ms. Reeves' routine is to ask donors about their donation history when she performs vein checks. ECF No. 37-5 at PageID.2691. However, Ms. Reeves has no independent memory of her discussion with Plaintiff. ECF No. 37-5 at PageID.2699.

Sylvia Roberts was the medical historian who obtained Plaintiff's capillary sample. She testified there were about three seconds between the capillary sample procedure and the time when Plaintiff's head went down. ECF No. 32-8 at PageID.2175. She explained she tried to catch Plaintiff from across the counter—she planted her feet, called out "help, help," and tried to avoid Plaintiff's head from hitting the floor. *Id.* However, Plaintiff's weight shifted, the chair turned, and

Plaintiff fell to the floor. *Id.* Sylvia Roberts was injured in her attempt to prevent Plaintiff from hitting her head on the floor and is currently on disability as a result. ECF No. 46-10 at PageID.5099-5100, 5128-5129.

## C.

Plaintiff remained in the hospital for a week after the incident. ECF No. 46-7 at PageID.4945. In the hospital she was primarily resting and being monitored. *Id.* at PageID.4946. Plaintiff had post-concussive syndrome and became dehydrated as a result of vomiting. ECF. No. 46-7 at PageID.4919-4920. She continued vomiting at the hospital and for about a week after she got home. ECF No. 46-7 at PageID.4947. She did not have any seizures in the hospital or at home afterward. *Id.* at PageID.4946. After she was released from the hospital, Tenley testified she "was incredibly dizzy . . . wasn't walking great, and . . . had to be washed." ECF No. 46-7 at PageID.4946. Dramatic changes in temperature would cause vertigo and dizziness. *Id.* She suffered from headaches for months after the accident. ECF No. 46-7 at PageID.4949. She was out of work and school for a month. ECF No. 46-7 at PageID.4951-4952. During the month after her accident she also struggled with dexterity in her hands. ECF No. 46-7 at PageID.4956. Plaintiff also suffered from "overwhelming anxiety" where she struggled to be alone. ECF No. 46-7 at PageID.4957. She saw a therapist to help her with her anxiety. ECF No. 46-7 at PageID.4959. She has some hearing loss in her left ear. ECF No. 46-7 at PageID.4967. Plaintiff also saw a chiropractic doctor, a neurologist, neurosurgeon, and an audiologist after the incident. ECF No. 46-7 at PageID.4917-4918, 4922, 4970-4972. She was directed by a doctor to take baby aspirin to help avoid blood clots. ECF No. 46-7 at PageID.4925-4926.

As of the date of her deposition, Plaintiff's remaining health difficulties include hearing loss in her left ear, anxiety and depression that is under control by medication, and a personality change from an extrovert to a more reserved person. ECF No. 46-7 at PageID.4975.

**II.**

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

**A.**

"In this Circuit it is well established that a federal court sitting in diversity applies the standard for a directed verdict used by the courts of the state whose substantive law governs the action." *Am. & Foreign Ins. Co. v. Gen. Elec. Co.*, 45 F.3d 135, 139 (6th Cir. 1995) (quoting *Potti v. Duramed Pharm., Inc.*, 938 F.2d 641, 645 (6th Cir. 1991)). In this case, Plaintiff filed her claim in Isabella County Circuit Court and Defendants, Biolife Plasma and Shire US, Inc., removed it based on diversity. ECF No. 1. Therefore, Michigan law applies to the negligence claim. There are four elements to a Michigan negligence claim – "(1) a duty owed by the defendant to the plaintiff;

(2) a breach of that duty; (3) causation; and (4) damages." *Case v. Consumers Power Co.*, 615 N.W.2d 17, 20 (Mich. 2000).

**B.**

Defendants make three arguments in their motion for summary judgment. First, Defendants contend that the law applicable to premises liability applies here and that the danger of the chair was open and obvious. Accordingly, they argue Defendants had no duty to inform Plaintiff of the potential danger of the design of the chair which she suggests should not have been selected for the procedure. ECF No. 32 at PageID.2115-2116. Second, they contend that Plaintiff assumed the risk of injury because she knew of her increased risk for a negative reaction when seeing blood and did not volunteer the information, regardless of whether she was asked. *Id.* at 2116. And third, Defendants reasonably contend that Plaintiff cannot satisfy her burden of causation because "she lacks evidence of cause in fact" because she cannot argue that a different chair would have led to a different outcome. *Id.* Defendant's motion for summary judgment will be denied in part because the law applicable to premises liability does not apply to Plaintiff's claim nor does the historical doctrine of assumption of the risk.

**i.**

Defendants premise their motion for summary judgment on the argument that the law of premises liability governs Plaintiff's negligent positioning claim. Defendants are correct that the Court has the ability to "look[] beyond mere procedural labels to determine the exact nature of the claim." *Buhalis v. Trinity Continuing Care Services*, 822 N.W.2d 254, 258 (Mich. Ct. App. 2012) (quoting *Adams v. Adams*, 742 N.W.2d 399, 403 (Mich. Ct. App. 2007)).

However, this is not a case where Plaintiff incorrectly brought a general negligence claim rather than a premises liability claim. Premises liability focuses on the land owner's duty to those

who encounter potentially dangerous conditions on land. The Michigan Supreme Court has held that "[o]wners and occupiers of land are in a special relationship with their invitees . . . . [and] [t]he possessor of land has a duty to exercise reasonable care to protect invitees from an unreasonable risk of harm caused by a dangerous condition of the land." *Williams v. Cunningham Drug Stores, Inc.*, 418 N.W.2d 381, 383 (Mich. 1988). A "merchant may be held liable for injuries resulting from negligent maintenance of the premises." *Id.* "The starting point for any discussion of the rules governing premises liability law is establishing what duty a premises possessor owes to those who come onto his land." *Hoffner v. Lanctoe*, 821 N.W.2d 88, 94 (Mich. 2012). However, Plaintiff does not allege dangerous conditions of the land, but rather negligent selection and positioning of Plaintiff in the chair. The theory of premises liability does not apply.

ii.

Second, Defendants argue that Plaintiff assumed the risk of Defendants negligent history claim when she failed to disclose her adverse donation history. ECF No. 32 at PageID.2130-2131. However, the Michigan Supreme Court eliminated the assumption of the risk doctrine in favor of the contributory negligence standard, except for employment relationships and contracts where a party assumes a particular risk. *Felgner v. Anderson*, 133 N.W.2d 136, 153 (Mich. 1965). The doctrine is also applicable to cases involving voluntary recreational activities such as ice skating or skiing. *See Ritchie-Gamester v. Berkley*, 597 N.W.2d 517 (Mich. 1999); *Rusnak v. Walker*, 729 N.W.2d 542 (Mich. Ct. App. 2006).

Defendants reliance on *Hunley v. DuPont Automotive* is without merit because the case at hand posits an issue of secondary assumption of the risk, not primary. *Hunley v. DuPont Automotive*, 341 F.3d 491 (6th Cir. 2003). Primary assumption of the risk "involves a situation in which the defendant does not owe a duty of care to the plaintiff because the plaintiff agreed in

advance to relieve the defendant of a duty of care" while secondary assumption of risk "involves a situation in which the plaintiff voluntarily encounters a known risk without first manifesting assent to relieve the defendant of liability." *Hunley*, 341 F.3d at 501. While primary assumption of risk has limited applicability in employment cases, secondary assumption of the risk has been eliminated in Michigan. *Hunley*, 341 F.3d at 501. Unlike in *Hunley* where the plaintiff was an independent contractor who was "injured while he was performing one of the very tasks that he was hired to perform: providing a head count to the fire brigade captain," Plaintiff was a potential donor who was being screened for her ability to donate plasma. *Hunley*, 341 F.3d at 502–03. Defendant's motion for summary judgment based on assumption of the risk will be denied.

### III.

Accordingly, it is **ORDERED** that Defendants Biolife and Shire Pharmaceuticals motion for summary judgment, ECF No. 32, is **DENIED IN PART.**

It is further **ORDERED** that Plaintiff is **DIRECTED** to submit a brief no longer than two pages on or before **December 30, 2019** explaining if she intends to prosecute the negligent positioning theory.

It is further **ORDERED** that Plaintiff and Defendants are **DIRECTED** to submit up to 15 pages of supplemental briefing 1) addressing the elements of a general negligence claim to the theories advanced by Plaintiff and 2) the application of Michigan comparative negligence law to the case. Supplemental briefing is due on or before **January 14, 2020**. The parties may submit a five-page response to the opposing party's brief that is due on or before **January 22, 2020**.

Dated: December 20, 2019                  s/Thomas L. Ludington
                                                                                  THOMAS L. LUDINGTON
                                                                                    United States District Judge