UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

TENLEY MCLAUGHLIN GOOD,

        Plaintiff,                  Case No. 18-11260

v.                                     Honorable Thomas L. Ludington

BIOLIFE PLASMA SERVICES, L.P.;
and SHIRE PHARMACEUTICALS aka
SHIRE US, INC.,

        Defendants.
_____/

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, AND DENYING ALL REMAINING MOTIONS AS MOOT**

Plaintiff, Tenley McLaughlin Good, filed a complaint in Isabella County Circuit Court on March 23, 2018 alleging malpractice and ordinary negligence by Defendants, Biolife Plasma Services and Shire Pharmaceuticals. ECF No. 1 at PageID.1, 11-12. Defendants removed the case to federal court based on diversity jurisdiction on April 20, 2018. ECF No. 1 at PageID.2. The parties submitted a joint stipulation dismissing Plaintiff's medical malpractice claim on August 20, 2019. ECF No. 35.

On August 14, 2019 Defendants filed a joint motion for summary judgment. ECF No. 32. Plaintiff also filed a dispositive motion for partial summary judgment. ECF No. 37. Responses and replies were timely filed. ECF Nos. 32, 37, 45, 46, 49, 52, and 53. On December 20, 2019, Defendants' motion for summary judgment was denied in part as to their premises liability and assumption of the risk doctrine defenses. ECF No. 75. Supplemental briefing was directed on the elements of a general Michigan negligence claim and the application of Michigan comparative

negligence law. *Id.* Supplemental briefing and responses were timely filed. ECF Nos. 76, 77, 78, 79, 80, 81.

**I.**

Tenley McLaughlin Good grew up with a tendency to get light-headed and/or faint when she saw blood. When Tenley was seven or eight, she cut her hand on glass and had a negative reaction to seeing the blood. ECF No. 32-5 at PageID.2162. Tenley once fainted when her father cut the family's dog's nails too short and caused the dog to bleed. ECF No. 32-4 at PageID.2159. Tenley became very pale and unstable. *Id.* Tenley also became dizzy after she had her ears pierced. ECF No. 32-5 at PageID.2163. When Tenley was in junior high, her sister sliced her hand in the kitchen and Tenley passed out after observing the blood. ECF No. 53-2 at PageID.6543.

Despite her struggles with the sight of blood, Tenley "had always donated blood [because] it was a big deal to her." ECF No. 32-5 at PageID.2164. In high school, Tenley and her friend "were racing for their gallon tag because . . . it saves lives." *Id.* In 2011 when Tenley was about 16, she tried to donate blood at a MI Blood donation center for the first time. ECF No. 32-5 at PageID.2162; ECF No. 32-3 at PageID.2152. She fainted after her finger was pricked for a capillary sample to verify her eligibility to donate blood. ECF No. 32-5 at PageID.2162; ECF No. 32-3 at PageID.2152. On June 7, 2012, she tried to donate blood again. Tenley had no observable reaction when the capillary sample was taken, but passed out when the bag began filling with blood. ECF No. 32-3 at PageID.2152. On another occasion, according to Tenley's mother, she attempted to donate blood at an ice rink in Gladwin, Michigan and later became dizzy. ECF No. 32-5 at PageID.2163. As a result of her difficulty donating blood, MI Blood noted in her internal chart that she had to be supine when donating. ECF No. 32-5 at PageID.2162.

**A.**

Biolife Plasma Services describes its mission on its website to be to "provide the highest-quality plasma to meet the expectations of our customers, ensuring the availability of life-saving therapies for patients." Biolife Plasma Services, *Who We Are*, https://www.biolifeplasma.com/us/#/about-biolife/who-we-are (last accessed Feb. 10, 2020). Plasma "is the pale yellow liquid portion of your blood that can be easily replaced by the body. It consists mainly of water and proteins, which help your body control bleeding and infection." Biolife Plasma Services, *What is Plasma*, https://www.biolifeplasma.com/us/#/about-plasma/what-is-plasma (last accessed Feb. 10, 2020). "Plasma-based therapeutics are used in the treatment of serious disorders such as hemophilia and immune system deficiencies, and to treat victims of shock and burns." *Id.* The plasma donation process involves withdrawing whole blood from the body, separating out the plasma, and returning the remainder of the blood (red blood cells, while blood cells, and platelets) to the donor. Biolife Plasma Services, *Working Together to Save Lives*, http://www.prod.biolifeplasma.com/downloads/biolife-press-kit.pdf (last accessed Feb. 10, 2020).

**B.**

Biolife Plasma has a procedure for assessing new plasma donors. Katie Pietrzak, the Mount Pleasant Center Director, and Amy Parks, an RN, testified about the procedures they follow for plasma donors. The process begins with a customer's check-in with the receptionist and medical historian, followed by a check for an adequate donation vein by a phlebotomist, a capillary sample taken by a medical historian, and finally a health questionnaire and physical exam with a nurse. ECF No. 32-2 at PageID.2144; ECF No. 49-9 at PageID.5962. Each step of the process helps

determine whether the donor meets the criteria to donate plasma. ECF No. 32-2 at PageID.2142. A repeat donor has a shorter process that proceeds in a different order. *Id.* at PageID.2144-2145.

For a first time donor, the receptionist obtains the donor's identification, social security card, and address. ECF No. 53-3 at PageID.6550. Next, the receptionist or a medical historian completes a new donor chart, determines if the potential donor is on the unacceptable address list or a NDDR list (a list of donors who were denied at another facility), takes the donor's picture, and has the donor read the consent to take blood out loud. The donor must then "sign" the consent by digitally scanning their fingerprint. ECF No. 53-3; ECF No. 49-9 at PageID.5962. The consent statement provides:

> I voluntarily consent to the withdrawal of my blood for the purpose of laboratory testing. It is understood that the blood is to be used solely for the purpose of testing for donor eligibility. I understand that this consent will remain in effect as long as I am a plasmapheresis donor and that I am free to withdraw from the program at any time. ECF No. 53-4 at PageID.6553.

The phlebotomist then completes a vein check of the potential donor and inquires if the donor has donated blood or plasma before and if so, if the donor suffered an adverse reaction. ECF No. 32-2 at PageID.2413; ECF No. 32-6 at PageID.2168. The phlebotomist initials and dates the Donor Identification Form ("DIF") after completing the vein check. ECF No. 53-5 at PageID.6556-6557. The DIF does not have a specific question about whether the donor has had a reaction to past blood donations. ECF No. 32-2 at PageID.2143.

If the donor communicates to the phlebotomist or anyone else during the donor screening process that they have had adverse reactions to donating blood or plasma in the past, the screening process stops and the donor is sent to the nurse. ECF No. 32-6 at PageID.2168. If the donor does not disclose an adverse donation history, the medical historian obtains a capillary sample by

pricking the donor's finger with a lancet to measure the protein levels in the donor's blood.[1] ECF No. 46-11 at PageID.5212; ECF No. 46-8 at PageID.5025. They "take a cleaning swab, a wipe and clean the finger and then [they] poke the blood and then [they] squeeze" the finger and collect the blood. ECF No. 32-8 at PageID.2174. The medical historian talks with donors throughout the process. ECF No. 32-8 at PageID.2175. Medical historians are trained to inform donors that a capillary sample will be taken, but not to inform the customer of the timing of the finger prick procedure. ECF No. 49-8 at PageID.5958. If the donor has an adverse reaction during the procedure, medical historians are trained to hold the donors' hands and call for a nurse. ECF No. 49-9 at PageID.5963. After the capillary sample, the donor meets with the nurse for a physical evaluation and is asked to complete a health history questionnaire, which includes questions about the donor's donation history. ECF No. 49-9 at PageID.5963.

Katie Pietrzak, the Center Director, testified that one of her jobs is to review adverse reactions by donors. ECF No. 77-5 at PageID.8252. She testified that is "a very rare instance where a donor will have any kind of symptoms of reaction from the screening process," but "it's certainly possible" that someone might react to the capillary sample. *Id.* She explained that medical historians "are trained in reactions which allows them to observe signs and symptoms of somebody potentially having a reaction typically those type of symptoms include things like being pale or sweaty or the donor saying I feel dizzy or I feel faint, which allows [them] to address that situation before it becomes serious." *Id.* at PageID.8254. Reactions during the actual plasma donation process (i.e., not during the capillary sample) occur in every three or four donors out of a thousand and "a reaction that passes out is exceedingly rare." *Id.* at PageID.8258-8259. At the Mount Pleasant Center in 2018 there were three individuals that had a mild adverse reaction at some point

---

[1] The parties do not clearly explain the purpose of the capillary sample. It is unclear if the sample is used for more than checking protein levels.

during the screening process, "somewhere between donor entry and completing their questionnaire." ECF No. 77-5 at PageID.8260. Mild reactions include, "paleness, sweating, dizziness" or saying "I feel faint . . . [or] my heart is beating fast." *Id.*

**C.**

In September or October 2015 one of Plaintiff's classmates at Central Michigan University approached her about donating plasma at Biolife Plasma in Mount Pleasant, Michigan. ECF No. 32-3 at PageID.2154. Plaintiff did not do any research about Biolife or the plasma donation process. ECF No. 32-3 at PageID.2154. She was aware that giving plasma takes longer than giving blood and that a needle would have to be inserted in her arm. ECF No. 32-3 at PageID.2154. The night before Plaintiff arrived at Biolife, she stopped by her parents' home and told her mother that she was going to donate plasma. ECF No. 32-5 at PageID.2164. Plaintiff's mother told her "Well, make sure they know that you're not great with that" and Plaintiff responded "They'll take care of me just like Michigan Blood. They'll take care of me. Mom, you worry too much, they know what they're doing." *Id.* Plaintiff's mother works in the healthcare field and they "talk[ed] about like some of the products they make" with donated plasma and how "it helps hemophiliac kids." *Id.* They also talked about how important plasma donation is to emergency medicine but did not discuss the "nitty-gritty specifics of the mechanical nature" of donation. *Id.* Plaintiff's mother also testified that she knew Plaintiff would be paid for donating plasma, as would her classmate. *Id.*

On October 8, 2015, Plaintiff arrived at Biolife Plasma for the first time to donate plasma. ECF No. 32-3 at PageID.2154. Plaintiff approached the reception desk when she arrived and was asked to fill out a form, provide identification, and scan her fingerprint. *Id.* at PageID.2155. Usually the receptionist checks in the donor and the medical historian verifies the donor's ID, proof of address, and consent to take their blood. ECF No. 49-9 at PageID.5962. It is unclear from

the deposition testimony if the duties were divided between a receptionist and a medical historian in Plaintiff's case, but it is clear that she successfully proceeded through the registration process.

Plaintiff testified that the phlebotomist who performed the capillary sample procedure called her back, told her to have a seat, asked for her hand, and then pricked her finger for the capillary sample. ECF No. 32-3 at PageID.2155-2156. She has no memory of the vein check procedure being performed or the question about prior problems with blood donation procedures but acknowledges that her "memory at that moment is not great" and "[the vein check] may have" happened. ECF No. 32-3 at PageID.2156. Plaintiff's DIF is initialed by Julida Griffin Reeves. ECF No. 53-4 at PageID.6553. Ms. Reeves testified that she performed the vein check on Plaintiff because she recognizes her writing where she initialed and dated Plaintiff's DIF indicating she performed the vein check. ECF No. 32-9 at PageID.2179. Ms. Reeves' routine is to ask donors about their donation history when she performs the vein check. ECF No. 37-5 at PageID.2691. However, she has no independent memory of her discussion with Plaintiff. ECF No. 37-5 at PageID.2699.

Sylvia Roberts was the medical historian who obtained Plaintiff's capillary sample. She testified there were about three seconds between the capillary sample procedure and the time when Plaintiff's head went down. ECF No. 32-8 at PageID.2175. She explained she tried to catch Plaintiff from across the counter—she planted her feet, called out "help, help," and tried to avoid Plaintiff's head from hitting the floor. *Id.* However, Plaintiff's weight shifted, the chair turned, and Plaintiff fell to the floor. *Id.* According to the Center Director, Plaintiff did not exhibit any adverse symptoms, such as being pale, sweaty, or saying she was dizzy, before she fainted. ECF No. 77-5 at PageID.8254. She was nervous, but nerves alone, especially for a new donor, are not a sign of a potential adverse reaction. *Id.* Sylvia Roberts was injured in her attempt to prevent Plaintiff from

hitting her head on the floor and is currently on disability as a result. ECF No. 46-10 at PageID.5099-5100, 5128-5129.

**D.**

Plaintiff remained in the hospital for a week after the incident. ECF No. 46-7 at PageID.4945. In the hospital she was primarily resting and being monitored. *Id.* at PageID.4946. Plaintiff had post-concussive syndrome and became dehydrated as a result of vomiting. ECF No. 46-7 at PageID.4919-4920. She continued vomiting at the hospital and for about a week after she got home. ECF No. 46-7 at PageID.4947. She did not have any seizures in the hospital or at home. *Id.* at PageID.4946. After she was released from the hospital, Tenley testified she "was incredibly dizzy . . . wasn't walking great, and . . . had to be washed" because she could not bathe herself. ECF No. 46-7 at PageID.4946. Dramatic changes in temperature would cause vertigo and dizziness. *Id.* She suffered from headaches for months after the accident. ECF No. 46-7 at PageID.4949. She was out of work and school for a month. ECF No. 46-7 at PageID.4951-4952. During the month after her accident she also struggled with dexterity in her hands. ECF No. 46-7 at PageID.4956. Plaintiff also suffered from "overwhelming anxiety" where she struggled to be alone. ECF No. 46-7 at PageID.4957. She saw a therapist to help her with her anxiety. ECF No. 46-7 at PageID.4959. She has some hearing loss in her left ear. ECF No. 46-7 at PageID.4967. Plaintiff also saw a chiropractic doctor, a neurologist, neurosurgeon, and an audiologist after the incident. ECF No. 46-7 at PageID.4917-4918, 4922, 4970-4972. She was directed by a doctor to take baby aspirin to help avoid blood clots. ECF No. 46-7 at PageID.4925-4926.

As of the date of her deposition, Plaintiff's remaining health difficulties include hearing loss in her left ear, anxiety and depression that is under control by medication, and a personality change from an extrovert to a more reserved person. ECF No. 46-7 at PageID.4975.

**II.**

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

**III.**

Plaintiff's complaint alleges one remaining count for general negligence. ECF No. 1 at PageID.12. However, Plaintiff is pursuing two separate theories of negligence or breach of duty. ECF Nos. 75, 76. Plaintiff alleges that Defendants violated the standard of care because they failed to "take an adequate history to disclose Plaintiff's history of fainting during blood draws." ECF No. 1 at PageID.12. Plaintiff also alleges negligence as a result of Defendants' failure to "position her in a safe chair or cot/gurney, with protective restraining components" in light of the risk that Plaintiff might have an adverse response to the capillary sample. ECF No. 1 at PageID.12. The first theory is referred to as the "negligent history" theory and the latter is the "negligent positioning" theory. *See* ECF No. 75 at PageID.8168.

**A.**

"In this Circuit, it is well established that a federal court sitting in diversity applies the standard for a directed verdict used by the courts of the state whose substantive law governs the action." *Am. & Foreign Ins. Co. v. Gen. Elec. Co.*, 45 F.3d 135, 139 (6th Cir. 1995) (quoting *Potti v. Duramed Pharm., Inc.*, 938 F.2d 641, 645 (6th Cir. 1991)). In this case, Plaintiff filed her claim in Isabella County Circuit Court and Defendants, Biolife Plasma and Shire US, Inc., removed it based on diversity. ECF No. 1. Therefore, Michigan law applies to the negligence claim. There are four elements to a Michigan negligence claim – "(1) a duty owed by the defendant to the plaintiff; (2) a breach of that duty; (3) causation; and (4) damages." *Case v. Consumers Power Co.*, 615 N.W.2d 17, 20 (Mich. 2000).

**B.**

Plaintiff first alleges Defendants were negligent because they did not obtain Plaintiff's donation history before obtaining the capillary sample. Defendants' initial response is to argue that Michigan law does not impose a duty upon Biolife to act reasonably. ECF No. 79 at PageID.8499. In their supplemental brief Defendants explain that Michigan law distinguishes between misfeasance and nonfeasance. ECF No. 79 at PageID.8502-8504. "In determining standards of conduct in the area of negligence, the courts have made a distinction between misfeasance, or active misconduct causing personal injury, and nonfeasance, which is passive inaction or the failure to actively protect others from harm." *Williams v. Cunningham Drug Stores, Inc.*, 418 N.W.2d 381, 382 (Mich. 1988). It is true that "as a general rule, there is no duty that obligates one person to aid or protect another." *Id.* The nonfeasance exceptions, such as ones for common carriers and innkeepers, do not apply here. Additionally, as previously addressed, the law of premises liability also does not apply. *See* ECF No. 75 at PageID.8169.

The Michigan Supreme Court has explained the "duty element questions whether an actor has a legal obligation 'to so govern his actions as not to unreasonably endanger the person or property of others.'" *Schultz v. Consumers Power Co.*, 506 N.W.2d 175, 177 (Mich. 1993) (quoting *Clark v. Dalman*, 150 N.W.2d 755, 760 (Mich. 1967)). "To require the actor to act, some sort of relationship must exist between the actor and the other party which the law or society views as sufficiently strong to require more than mere observation of the events which unfold on the part of the defendant. It is the fact of existence of this relationship which the law usually refers to as a duty on the part of the actor." *Schultz v. Consumers Power Co.*, 506 N.W.2d 175, 178 (Mich. 1993) (quoting *Samson v. Saginaw Prof'l Bldg. Inc.*, 224 N.W.2d 843, 849 (Mich. 1975)). "In determining whether a duty exists, courts examine a wide variety of factors, including the relationship of the parties and the foreseeability and nature of the risk. *Schultz v. Consumers Power Co.*, 506 N.W.2d 175, 178 (Mich. 1993). In *Schultz*, the Supreme Court held that Consumers Power had "a duty to reasonably protect members of the general public from any foreseeable danger from its power lines." *Schultz v. Consumers Power Co.*, 506 N.W.2d 175, 181 (Mich. 1993). The Supreme Court has also held that manufacturers and wholesalers owe a legal duty to those affected by the use of products that they market. *Moning v. Alfono*, 254 N.W.2d 759, 762 (Mich. 1977). Here Biolife engages with its donors to acquire and then commercially use the blood plasma. And, while the transaction involves payment to the donating customer, it also necessarily involves some potential medical risk. The donation process includes a vein check, capillary sample, physical exam with a nurse, and a 45 minute to an hour procedure where donors are supine and have a needle in their arm. ECF No. 49-9 at PageID.5962; ECF No. 49-7 at PageID.5946. It is reasonable to conclude that Biolife had a duty to exercise reasonable care for its customers.

Even though Defendants had a duty to ask Plaintiff about her donation history, Defendants have shown there is no genuine issue of material fact that they did not breach that duty. Plaintiff gave her consent to a capillary sample during the registration process. ECF No. 79-4 at PageID.8529. Ms. Reeves testified that her handwriting and initials are on Plaintiff's DIF indicating Plaintiff had a vein check. ECF No. 79-5 at PageID.8532. Although Ms. Reeves does not have a specific recollection of speaking with Plaintiff, she testified it is her routine procedure to ask all donors during the vein check about their donation history. ECF No. 77-4 at PageID.8236.

The only evidence Plaintiff has to contradict Defendants' evidence are Plaintiff's affidavit and Nurse Park's testimony. In her August 13, 2019 affidavit, Plaintiff avers "[d]uring the time I was [at Biolife], no person inquired of me as to any prior adverse reactions to any type of blood draw or donation, or the sight of blood. [] That during that time, no questions were posed to me in any format as to prior adverse reactions to any type of blood draw or donation or the sight of blood. [] That had such a question been posed to me I would have responded in the affirmative, as I had a history of adverse reactions as more specifically detailed in my deposition on November 8, 2018 in the case of Good v BioLife, et. al." ECF No. 77-12 at PageID.8335. However, Plaintiff testified previously at her deposition on November 8, 2018,

> Q. Okay. Do you recall having a vein check at BioLife?
> A. I do not. I do not recall that specifically.
> Q. Okay. Do you recall somebody sort of looking at your arms and your wrists and your skin to see whether your veins were in good enough shape to donate plasma?
> A. Not specifically, no.
> Q. Do you think that that could have happened and you don't recall it?
> A. It may have. The memory at that moment is not great –
> Q. Okay.
> A. – but I do not specifically remember.
> ECF No. 79-2 at PageID.8521-8522.

Plaintiff's deposition testimony that she does not remember the vein check and that her memory is "not great" demonstrates that she simply does not remember the events. In fact, Plaintiff does

not contest the fact that she did receive the vein check, despite Plaintiff's lack of memory regarding the event.

Moreover, a "witness is bound by his or her deposition testimony, and that testimony cannot be contradicted by affidavit in an attempt to defeat a motion for summary disposition." *Casey v. Auto Owners Ins. Co.*, 729 N.W.2d 277, 283 (Mich. App. 2006). Plaintiff testified during her deposition that she does not remember the vein check, but that her memory is "not good" and the vein check could have happened. Plaintiff cannot now attempt to modify her deposition testimony by claiming that she was not asked about her donation history, when she has previously acknowledged that her memory is "not good."

Plaintiff next argues that Nurse Parks testified that she believed that medical historians are required to ask donors about their donation history. ECF No. 77 at PageID.8190-8191; ECF No. 77-3 at PageID.8218-8219; ECF No. 37 at PageID.2524-2526. Plaintiff asserts that Ms. Roberts admitted she did not ask Plaintiff about her medical history. ECF No. 77 at PageID.8191; ECF No. 37 at PageID.2524-2526. Nurse Parks is a nurse at BioLife. She is not the director of the facility. Katie Pietrzak who is the director testified that phlebotomists are required to ask about donor's donation history during the vein check. Medical historians are not required to ask donors about their donation history. ECF No. 77-5 at PageID.8253-5284. Ms. Reeves documented the vein check and testified about her regular procedure to inquire about prior experiences providing blood during the vein check.

Defendants' motion for summary judgment will be granted on the negligent history theory of the negligence claim. Plaintiff has not demonstrated a genuine issue of fact with respect to the breach of duty or proximate cause elements of negligence by Defendants. Plaintiff's motion for summary judgment will be denied on the negligent history claim.

**C.**

Plaintiff's second theory is that Defendants negligently positioned her, thereby causing injury because there was a risk that Plaintiff would have an adverse response to the capillary sample. ECF No. 77 at PageiD.8195. Defendants argue in support of their motion for summary judgment that Plaintiff has not retained a biomechanical engineer to demonstrate that the chair was negligently designed to care for Plaintiff. ECF No. 79 at PageID.8507-8508. Defendants also explain Plaintiff offered no evidence that a different chair would have caused a different result. *Id.* Plaintiff responds by arguing that both of her experts, Nancy Erickson and Sean Stanley, testified that "Defendants failed to properly position Tenley Good during the screening process." ECF No. 77 at PageID.8195. However, Plaintiff's evidence does not support her claim that the probability of an adverse response to the capillary sample required different furniture or "protective restraining components."

Nancy Erickson, who was retained by Plaintiff, has been deposed as an expert in about 20 cases for phlebotomy-related injuries. ECF No. 78-1 at PageID.8342. She is currently employed by four companies. She provides training on needles, tubes, micro-collection tubes, lancets, and urine collections for Greiner Bio-One, is an accurate newborn screening trainer where she "trains people how to properly collect blood for newborn screening testing" and "provides in-home education for midwives in rural areas of Michigan" for an unidentified company, and she draws blood for DNA diagnostics and conducts buccal swabs for paternity tests for Specialized Blood Collection Services and DNA Diagnostics Center. ECF No. 78-1 at PageID.8346-8347. Ms. Erickson is also the chairperson of the CLSI Document Development Committee for the Capillary Blood Specimen Collections which creates standards for capillary samples. *Id.* at PageID.8348. Ms. Erickson's educational background includes a two year liberal arts education at Henry Ford

Community College and certificates for EMT Training, Newborn screening training, Star quality phlebotomy, EKG Technician, and Basic First aid/CPR training. ECF No. 77-2 at PageID.8207.

Plaintiff's second expert is Sean Stanley. Mr. Stanley received a medical assistant certificate and is currently studying for his Associate of Science in Health Care Management. ECF No. 77-8 at PageID.8326. His job history includes working as a phlebotomist and a phlebotomy manager where he trained staff and opened phlebotomy and patient service centers. ECF No. 78-2 at PageID.8401-8403. He is currently a director of phlebotomy where he assists with government compliance and inspections and runs centers in New Jersey, New York, and Connecticut. *Id.*

Ms. Erickson acknowledges that Biolife is not a medical laboratory nor was it Plaintiff's healthcare provider. ECF No. 78-1 at PageID.8354. That is, Plaintiff was not a patient of Biolife. Mr. Stanley testified that he was not aware of any plasma center using a phlebotomy chair for the purpose of taking a capillary sample. ECF No. 78-2 at PageID.8413. Both Ms. Erickson and Mr. Stanley criticize the selection of the chair Plaintiff was seated in during the capillary sample because it was capable of swiveling and could have been lower to the ground, but neither of them are qualified to assess the medical risk that donors might faint when furnishing a capillary sample. Moreover, Plaintiff never references, let alone addresses, the evidence that Plaintiff's response to the capillary sample was unique and not a reasonably foreseeable response.

Scott E. Smothers is a Registered Nurse and is one of Defendants' experts. His report reflects that over the course of thirty years as a Registered Nurse, "[t]his is the first time I have ever heard of someone fainting during screening process, including the 'fingerstick' to draw capillary blood." ECF No. 42-2 at PageID.3863. Rosemarie Figueroa, another of Defendants' experts, has a PhD in Industrial and Operations Engineering with "areas of expertise [in] Human Factors, Ergonomics and Biomechanics." ECF No. 37-10 at PageID.2887. In her report, she

summarized a study captioned by Crocco and D'Elia in 2007 that showed a vasovagal reaction (including agitation, sweating, dizziness, pins and needles) during blood donation occurred 0.2% of the time and the rate for loss of consciousness was 0.1%. ECF No. 42-6 at PageID.3894. She also explained the rate for loss of consciousness during a capillary sample procedure, as opposed to a blood donation, is "even lower." *Id.* at PageID.3895. Indeed, the testimony most favorable to Plaintiff in assessing the potential risk of passing out or getting "light headed [or] dizzy" as a result of a finger poke came from Amy Parks who testified that she had observed it "a couple of times" and Ms. Pietrzak's testimony that fainting is possible but exceedingly rare. ECF No. 49-9 at PageID.5963; ECF No. 77-5 at PageID.8252.

In summary, while it is possible that a different chair or chair configuration might have provided Plaintiff with greater safety, she has not rebutted the Defendants' contention that the probability of Plaintiff's event was so unlikely that failing to anticipate it was a breach of the standard of care. To the contrary, the fact that Plaintiff fainted appears to be specific to her medical circumstance, something that she alone was aware of. Accordingly, Defendants' motion for summary judgment on the negligent positioning theory will be granted. Because Defendants' motion for summary judgment will be granted, Plaintiff's motion for summary judgment on the negligent positioning theory will be denied.

**IV.**

Accordingly, it is hereby **ORDERED** that Defendants' motion for summary judgment, ECF No. 32, is **GRANTED**.

It is further **ORDERED** that Plaintiff's motion for partial summary judgment, ECF No. 37, is **DENIED**.

It is further **ORDERED** that motions regarding trial, ECF Nos. 33, 34, 38, 39, 58, 59, 82, 83, and 84, are **DENIED AS MOOT**.

It is further **ORDERED** that the complaint, ECF No. 1, is **DISMISSED WITH PREJUDICE**.

Dated: February 13, 2020                                s/Thomas L. Ludington
                                                        THOMAS L. LUDINGTON
                                                        United States District Judge