UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

TENLEY McLAUGHLIN GOOD,

                Plaintiff,                          Case No. 1:18-cv-11260

      v.                                    Honorable Thomas L. Ludington
                                              United States District Judge

BIOLIFE PLASMA SERVICES, L.P. and
SHIRE US, INC.,

                Defendants.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
MOTIONS IN LIMINE [ECF Nos. 111–14; 116] AND GRANTING PLAINTIFF'S
MOTION FOR LEAVE TO FILE SUPPLEMENTAL RESPONSES**

This is a negligence action arising from a donor's injury at a plasma-donation center. The

parties have filed five motions in limine. *See* ECF Nos. 111–14; 116. For the reasons stated

hereafter, their motions will be granted in part and denied in part as provided in Section IV *infra*.

**I.**

In October 2015, Plaintiff Tenley McLaughlin Good visited a plasma-donation center

operated by Defendant BioLife Plasma Services, L.P. *See Good v. Biolife Plasma Servs., L.P.*, No.

18-11260, 2020 WL 736005, at *3 (E.D. Mich. Feb. 13, 2020). During the donor-screening

process, a BioLife employee pricked Plaintiff's finger to collect a blood sample. *Id.* Plaintiff and

the employee collecting her sample, Sylvia Roberts, were seated across from each other at a small

counter. *Id.* at *4. Seconds after being pricked, Plaintiff fainted. *Id.* From across the counter,

Roberts attempted to hold Plaintiff upright, but Plaintiff swiveled out of her chair and fell to the

ground. *Id.* She spent a week in the hospital with post-concussive symptoms and now complains

of hearing loss and personality changes. *Id.*

In March 2018, Plaintiff filed a complaint against BioLife and its parent company, Shire Pharmaceuticals a/k/a Shire US, Inc., presenting two theories of liability.[1] First, she claims that Defendants negligently failed to take her medical history before collecting the capillary sample ("negligent-history theory"). *See id.* at *4. Had they collected her medical history, she argues, then they would have learned that she had previously fainted at the sight of blood then prevented her from donating. *See* Pl.'s Mot. for Partial Summ. J., ECF No. 37 at PageID.2527–28. Second, she claims that Defendants negligently positioned her for the sample, because they sat her in a relatively high swiveling chair and did not place Roberts close enough to prevent the fall ("negligent-positioning theory"). *See Good*, 2020 WL 736005, at *4, *7.

In August 2019, the parties filed cross-motions for summary judgment. After carefully reviewing the record, this Court granted summary judgment for Defendants. The problem with Plaintiff's negligent-history theory, this Court explained, was a lack of evidence supporting the notion that Defendants failed to take her medical history. *Id.* at *6. Although Plaintiff had filed an affidavit stating she was never asked about her medical history, that affidavit seemed to contradict her earlier deposition testimony that she could not remember the "vein check"[2] and was therefore disregarded. *Id.* Similarly, after reviewing the parties' expert reports, this Court found that the probability of Plaintiff fainting from a capillary sample was "so unlikely that failing to anticipate it was [not] a breach of the standard of care." *Id.* at *8.

---

[1] Plaintiff also brought a claim for medical malpractice but later stipulated to its dismissal. *See* ECF Nos. 1 at PageID.11; 28.

[2] The "vein check" is a process in which a BioLife employee examines a potential donor's veins to verify their suitability for donation. *See Good v. Biolife Plasma Servs., L.P.*, No. 18-11260, 2020 WL 736005, at *2 (E.D. Mich. Feb. 13, 2020). Plaintiff's vein check was performed by Julida Reeves, who testified that it was her regular practice to ask the donor during the vein check about prior adverse reactions. *Id.*

The Sixth Circuit Court of Appeals had a different view of the evidence. Regarding Plaintiff's negligent-history theory, the Sixth Circuit found no "direct contradiction" between Plaintiff's deposition testimony and affidavit and, therefore, found a triable question of fact on the negligent-history theory. *See Good v. BioLife Plasma Servs., L.P.*, 834 F. App'x 188, 196 (6th Cir. 2020). As for Plaintiff's negligent-positioning theory, the Sixth Circuit concluded that the risk of fainting during capillary-sample collection was "small" but "foreseeable" given the substantial number of donors that BioLife sees each year. *Id.* at 196–97 (noting that "BioLife sees around 100,000 donors every year"). Therefore, according to the Sixth Circuit, a reasonable jury could have found that BioLife was negligent for not providing Plaintiff with a different chair. *Id.* at 198.

The Sixth Circuit also addressed the issue of causation because Defendants raised it as an alternative basis for affirming summary judgment. *Id.* at 198. Based on the expert reports and Roberts's testimony on the swiveling chair, the Sixth Circuit concluded that a reasonable juror could find that Defendants' conduct was the but-for and legal cause of Plaintiff's injury. *Id.* at 198–99. Accordingly, the Sixth Circuit reversed summary judgment for Defendants and remanded the case to this Court for further proceedings. *Id.* at 200.

Since the case was remanded, the parties have filed several motions in limine, including expert challenges. ECF Nos. 111–16. Recently, this Court resolved one of those motions when it denied Defendants' motion to exclude two of Plaintiff's liability experts. *Good v. BioLife Plasma Servs., L.P.*, No. 1:18-CV-11260, 2022 WL 188125, at *1 (E.D. Mich. Jan. 19, 2022).[3] The other five motions, however, remain pending.

---

[3] The two liability experts in question, Stanley T. Nelson and Nancy Erickson, are expected to testify that Plaintiff's reaction was foreseeable, and that BioLife should have taken certain precautions to prevent her fall.

Having reviewed the parties' briefing, this Court finds that a hearing is unnecessary and will proceed to address the remaining motions on the papers. *See* E.D. Mich. LR 7.1(f)(2).

## II.

A "motion in limine" is any motion "to exclude anticipated prejudicial evidence before the evidence is actually offered." *Louzon v. Ford Motor Co.*, 718 F.3d 556, 561 (6th Cir. 2013) (quoting *Luce v. United States*, 469 U.S. 38, 40 n.2 (1984)). In essence, motions in limine are "designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions." *Id.* (quoting *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1069 (3d Cir. 1990)).

Given that motions in limine often rely on a limited factual record, they should only be granted if "[the] evidence [in question] is clearly inadmissible on all potential grounds.'" *United States v. Phillips*, 146 F. Supp. 3d 837, 841 (E.D. Mich. 2015) (quoting *Ind. Ins. v. Gen. Elec. Co.*, 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004)). "In cases where that high standard is not met, 'evidentiary rulings should be deferred until trial so that questions of foundation, relevancy, and potential prejudice may be resolved in proper context.'" *Id.* (same).

The threshold issue of admissibility is relevance. Under Federal Rule of Evidence 401, "evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." FED. R. EVID. 401.

Although relevant evidence is presumptively admissible, FED. R. EVID. 402, it may be excluded for numerous reasons.

Under Federal Rule of Evidence 403, "a trial court may exclude relevant evidence if its probative value is substantially outweighed by the risk of one or more of the following: unfair

prejudice, confusing the issues, misleading the jury, undue delay, wasting time or needless presenting cumulative evidence." FED. R. EVID. 403. As used in Rule 403, the term "unfair prejudice" means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Old Chief v. United States*, 519 U.S. 172, 180 (1997).

Similarly, under Federal Rule of Evidence 803, hearsay is generally inadmissible. Hearsay is any "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 577 n.1 (6th Cir. 2012) (quoting *United States v. Rodriguez–Lopez*, 565 F.3d 312, 314 (6th Cir. 2009). Yet, like other evidentiary rules, the rule against hearsay is subject to a plethora of exceptions. *See* FED. R. EVID. 801(d), 803, 804.

Each of these evidentiary rules and principles, among others, guide this Court's analysis in Section III *infra*.

### III.

Plaintiff has filed motions to (1) compel the display of a real-time transcript at trial, (2) allow certain witnesses to testify via videoconference, and (3) compel Defendants to produce certain current and former employees for examination. ECF Nos. 111; 112; 113. Defendants have filed motions to (1) limit the testimony of Plaintiff's treating neurosurgeon and (2) exclude 11 categories of evidence. ECF Nos. 114; 116. Plaintiff's motions will be addressed in Section III.A, and Defendants' motions will be addressed in Section III.B.

### A.

### i.

Plaintiff first requests "a certified court report[er] [to be] present during certain testimony to record in real time and present to the jury excerpts of [the] testimony." ECF No. 111 at

PageID.9036. She argues that a real-time transcript "would efficiently present the evidence, much in the same way as a juror notetaking, and further enhance the determination of the truth." *Id.* at PageID.9038.

Defendants argue that a real-time video feed would distract the jury from other aspects of witness testimony, such as demeanor, and would "effectively interject argument into the examination process and create an emphasis on certain testimony that is unfairly prejudicial." *See* ECF No. 127 at PageID.10192–93.

Plaintiff's motion will be denied because this Court does not possess the technical capacity to produce a real-time transcript. Although real-time transcripts are sometimes used to accommodate those with hearing disabilities, they often prove difficult for court reporters and court technical specialists to manage. *See* Douglas M. Pravda, *Understanding the Rights of Deaf and Hard of Hearing Individuals to Meaningful Participation in Court Proceedings*, 45 VAL. U. L. REV. 927, 934–39 (2011). Further, for even the most capable court reporters, creating an accurate transcript requires substantial time and effort. And even if a real-time transcript were technically feasible, it would likely distract the jury from other indicia of credibility.

Accordingly, Plaintiff's motion for a real-time transcript will be denied.

### ii.

Plaintiff next seeks leave for several witnesses to testify via videoconference. ECF No. 112. The circumstances of each witness are considered below.

### a.

First is Dr. Thomas O'Hara, the neurosurgeon who treated Plaintiff after her injury and who has since passed away. *Id.* at PageID.9050. Plaintiff proposes reading Dr. O'Hara's deposition

transcript to the jury. *Id.* at PageID.9056–57. Defendants do not oppose this request. ECF No. 126 at PageID.10170.

The use of deposition testimony at trial is governed by Federal Rule of Civil Procedure 32, which provides, in relevant part:

> (4) Unavailable Witness. A party may use for any purpose the deposition of a witness, whether or not a party, if the court finds:
>     (A) that the witness is dead;
>     (B) that the witness is more than 100 miles from the place of hearing or trial or is outside the United States, unless it appears that the witness's absence was procured by the party offering the deposition;
>     (C) that the witness cannot attend or testify because of age, illness, infirmity, or imprisonment;
>     (D) that the party offering the deposition could not procure the witness's attendance by subpoena; or
>     (E) on motion and notice, that exceptional circumstances make it desirable--in the interest of justice and with due regard to the importance of live testimony in open court--to permit the deposition to be used.

FED. R. CIV. P. 32(a)(4).

Here, the parties agree that Dr. O'Hara passed away in November 2020. Consequently, Plaintiff may read his deposition transcript into the record at trial.

**b.**

Next is Dr. Scott Zimostrad, a neuropsychologist who examined Plaintiff after her injury. ECF No. 112 at PageID.9050. Doctor Zimostrad is apparently "willing to attend the trial" but might become unavailable due to "last-minute" conflicts with his treatment schedule. *Id.* at PageID.9057. Plaintiff therefore argues that Dr. Zimostrad should be allowed to testify remotely. *Id.* She adds that remote testimony would be preferable given the risk of COVID-19. *Id.*

Witness testimony "must be taken in open court unless a federal statute, the Federal Rules of Evidence, the[] [Federal Rules of Civil Procedure], or other rules adopted by the Supreme Court provide otherwise." FED. R. CIV. P. 43(a). Witnesses may, however, testify by "contemporaneous

transmission from a different location" based on "good cause in compelling circumstances and with appropriate safeguards." *Id.*

Early in the pandemic, this Court held that witnesses could testify remotely due to the risk of COVID-19. *See Gould Elecs. Inc. v. Livingston Cnty. Rd. Comm'n*, 470 F. Supp. 3d 735, 740 (E.D. Mich. 2020). However, given the development of COVID-19 vaccines and therapeutic treatments, the public-health situation has improved substantially. Indeed, in the last eight months, this Court has resumed all in-person proceedings, including jury trials. Accordingly, the COVID-19 pandemic alone, at least at this juncture, does not justify Dr. Zimostrad testifying remotely.

Similarly, Plaintiff has not shown good cause for reading Dr. Zimostrad's deposition at trial. There is no evidence that Dr. Zimostrad (1) lives more than 100 miles from the courthouse, (2) cannot testify due to "age, illness, infirmity or imprisonment," or (3) could not be subpoenaed. *See* FED. R. CIV. P. 32(a)(4) (providing grounds for using deposition testimony at trial). Nor is there any evidence of "exceptional circumstances" justifying the use of his deposition in lieu of his live testimony. *See* FED. R. CIV. P. 32(a)(4)(E). Although Dr. Zimostrad likely has a busy treatment schedule, the Sixth Circuit has held that doctors are not "automatically unavailable" for trial due to the scheduling demands of their occupation. *See Allgeier v. United States*, 909 F.2d 869, 876 (6th Cir. 1990).

For these reasons, Dr. Zimostrad must testify in person absent some specific evidence of exceptional circumstances.

### c.

Next is Dr. Katherine Heidenreich, an otolaryngologist who examined and advised Plaintiff regarding her hearing loss. ECF No. 112 at PageID.9050. Plaintiff seeks to allow Dr. Heidenreich to testify remotely due to her distance from the courthouse. *Id.* at PageID.9058. Doctor

Heidenreich's exact distance, however, remains a matter of debate. By Plaintiff's estimation, Dr. Heidenreich's residence is 102 miles away, while her office, located in the University of Michigan Medical Center, is just under 100 miles away. *Id.* This Court, however, estimates Dr. Heidenreich's office to be 100.4 miles away, using Google Maps, and Defendants estimate it to be 96.9 miles away, using MapQuest. ECF No. 126 at PageID.10176.

Under Rule 45, courts may subpoena a nonparty witness for trial only if "[she] resides, is employed, or regularly transacts business in person" "within 100 miles" of the courthouse. FED. R. CIV. P. 45(c)(1)(A).

Based on their research, Defendants contend that Dr. Heidenreich's office falls within the 100-mile radius of the courthouse. *See* ECF No. 126 at PageID.10176. Yet as noted above, this Court reached the opposite conclusion using a different navigation service. At this juncture, this Court is satisfied that Dr. Heidenreich's office and residence are farther than 100 miles from the courthouse. Therefore, she will be permitted to testify via videoconference unless Defendants can conclusively demonstrate that she works, resides, *or* regularly transacts business within 100 miles of the courthouse.

### d.

Next is Sara Sisco, N.P., who treated Plaintiff in the hospital after her injury. ECF No. 112 at PageID.9059. Plaintiff argues that NP Sisco should be allowed to testify remotely "depending upon the trial schedule and [her] patient schedule." *Id.* Plaintiff does not claim that NP Sisco resides or works outside this Court's subpoena range. Nor has she presented evidence of a specific conflict between NP Sisco's treatment schedule and the trial schedule.

Accordingly, NP Sisco must testify in person unless Plaintiff presents specific evidence of good cause and compelling circumstances closer to trial.

**e.**

Next is Dr. Richard Chesbrough, a radiologist whom Plaintiff retained to supplement the opinion of her treating providers. ECF No. 112 at PageID.9059. Because Dr. Chesbrough resides and works in California, he is outside this Court's subpoena range. *See* FED. R. CIV. P. 45(c)(1)(A). Still, Plaintiff's request will be denied, because this Court previously held that Dr. Chesbrough may not testify.

In June 2019, Plaintiff filed a motion to amend the scheduling order to allow her to designate Dr. Chesbrough as an expert witness. ECF No. 20. According to Plaintiff, she did not designate Dr. Chesbrough in a timely manner because she retained him to rebut a supplemental expert report that Defendants served on the last day of discovery. *Id.* at PageID.104–05. This Court denied Plaintiff's motion, noting that Defendants' supplemental report did not raise new issues justifying a rebuttal. *See Good v. Biolife Plasma Servs., L.P.*, No. 18-CV-11260, 2019 WL 3239151, at *1 (E.D. Mich. July 18, 2019). This Court also noted that, under Rule 37(c)(1), the "automatic and mandatory" sanction for untimely disclosures was exclusion. *Id.* (quoting *Dickenson v. Cardiac & Thoracic Surgery of E. Tenn.*, 388 F.3d 976, 983 (6th Cir. 2004)).

Plaintiff contends that the new scheduling order, entered on remand in February 2021, allowed her to designate Dr. Chesbrough because it set a renewed date for "Rule 26 Disclosures." *See Good*, slip op. at 5 (Feb. 9, 2021), ECF No. 109; ECF No. 130 at PageID.10219. But the term "Rule 26 Disclosures" refers to disclosures of trial witnesses and exhibits under Rule 26(a)(3)(A), not to discovery disclosures generally. Accordingly, the new scheduling order was not an opportunity for Plaintiff to avoid the "the automatic and mandatory sanction of [exclusion]" by designating Dr. Chesbrough. *Good*, 2019 WL 3239151, at *1.

For these reasons, Dr. Chesbrough may not testify.

### iii.

Plaintiff next seeks to compel Defendants to produce seven current and former BioLife employees for examination at trial, each of whom Plaintiff previously deposed. ECF No. 113. Defendants do not oppose Plaintiff's motion except as to former BioLife employee Amy Parks. ECF No. 128 at PageID.10199. Parks currently works as a nurse in the COVID-19 unit at a nearby hospital. *Id.* Defendants explain that, as a result, Parks might not be available to testify in person. *Id.* To the extent that either side seeks to allow Parks to testify via videoconference, this Court will not consider that request until specific evidence of her availability is furnished.

Accordingly, Plaintiff's motion to compel Defendants to produce its current and former employees at trial will be denied as moot.

### B.

### i.

Defendants first seek to limit the testimony of Dr. O'Hara, Plaintiff's treating neurosurgeon. ECF No. 114. Doctor O'Hara first saw Plaintiff in the emergency room shortly after her injury and continued to treat her for several months. ECF No. 122 at PageID.9884–85. During his deposition, Dr. O'Hara opined that Plaintiff had likely suffered a "basilar skull fracture." *Id.* at PageID.9885–86. As previously noted, Dr. O'Hara passed away in November 2020, and Plaintiff intends to read his deposition into the record at trial. *See* discussion *supra* Section III.A.ii.a. Because Plaintiff did not serve an expert report for Dr. O'Hara, she may only introduce those portions of his testimony that were "within the scope of treatment and diagnosis." *Avendt v. Covidien Inc.*, 314 F.R.D. 547, 559 (E.D. Mich. 2016) (quoting 1 FEDERAL RULES OF CIVIL PROCEDURE, RULES AND COMMENTARY RULE 26)).

- 11 -

Defendants argue that Dr. O'Hara's skull-fracture opinion should be excluded because (1) it was not formed during the course of Plaintiff's treatment and (2) lacks a reliable factual and scientific basis. ECF No. 114 at PageID.9115–20.

**a.**

Defendants' claim that Dr. O'Hara formed his skull-fracture opinion outside the scope of treatment is unsupported by the record. Defendants' claim rests largely on the absence of any fracture diagnosis in Dr. O'Hara's treatment records. *See id.* at PageID.9114–15. But as Dr. O'Hara explained during his deposition, on the day of Plaintiff's injury, "[he] was far more concerned about the bleeding inside of her head" than "the possibility of [a] basilar skull fracture." ECF No. 43-4 at PageID.4069. Doctor O'Hara only began to consider the possibility of a skull fracture "[l]ater on, when [Plaintiff] really began to note the hearing loss . . . [after] getting back to normal activities." *Id.* at PageID.4070. Doctor O'Hara then "went back through the CAT scans and MRI scans" and noticed "the fluid in the mastoid sinuses," which he associated with a basilar skull fracture. *Id.*

Defendants do not squarely address Dr. O'Hara's explanation. Instead, they emphasize a later portion of his testimony in which he acknowledges that his skull-fracture opinion is not reflected in his treatment records:

> Q:   The portion of your opinion that you just stated, and that you described—that you said that's not described in your medical records; is that correct?
> A.   Well, the changes in—you know, in the mastoid sinuses and things are all described in the—I've commented on that and…
> Q:   Right.
> A.   Yeah
> Q:   The portion that there was some sort of skull fracture or injury to the ear, that's not documented in your records correct; correct?
> A:   No, no. That's all, you know, based on your questions now, I guess.

*Id.* at PageID.4107.

Defendants view this exchange as "unambiguous" evidence that Dr. O'Hara formed his opinion "based on [defense counsel's] questions." ECF No. 133 at PageID.10354–55. But this exchange occurred immediately after Dr. O'Hara provided the scientific basis for his opinion. *See id.* at PageID.10353–54. So, in testifying that his opinion was "based on [defense counsel's questions]," Dr. O'Hara was merely acknowledging that the detailed explanation he had "just stated" was "not documented in [his] records." *Id.* Indeed, Dr. O'Hara's earlier testimony was that he first considered the possibility of a basilar skull fracture when Plaintiff began to complain of hearing loss after resuming normal activities. *See* ECF No. 43-4 at PageID.4070.

Accordingly, Dr. O'Hara's skull-fracture opinion falls within the scope of his treatment.

**b.**

Defendants' claim that Dr. O'Hara's opinion lacks a reliable basis is also unpersuasive. The admissibility of treating physician testimony, like other expert testimony, is governed by Federal Rule of Evidence 702. *See Gass v. Marriott Hotel Servs., Inc.*, 558 F.3d 419, 426 (6th Cir. 2009). Generally, "[f]or expert testimony to be admissible, the court must find the expert to be: (1) qualified; (2) her testimony to be relevant; and (3) her testimony to be reliable." *Osborn v. Griffin*, 865 F.3d 417, 452 (6th Cir. 2017) (quoting *United States v. LaVictor*, 848 F.3d 428, 441 (6th Cir. 2017)).

In the seminal *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court identified several factors that courts may consider in assessing whether an opinion is reliable, including whether the expert's methods are testable, subject to peer review, or "generally accepted." 509 U.S. 579, 592–95 (1993). Yet the *Daubert* factors "do not constitute 'a definitive checklist or test'" and do not apply in every case. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (quoting *Daubert*, 509 U.S. at 593). "Rather, the law grants a district court the same

broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* at 142.

While Plaintiff was hospitalized, Dr. O'Hara physically examined her head and neck and obtained MRI and CAT scans of her skull. *See* ECF No. 43-4 at PageID.4069–70. Although the scans revealed no fracture, Dr. O'Hara eventually concluded that Plaintiff had suffered a fracture based on the trauma to her left ear, "the fluid in the mastoid sinuses," "the fluid in the sphenoid sinus," and the subsequent hearing loss. *Id.* at PageID.4106. The lack of MRI or CAT scan evidence was unsurprising to Dr. O'Hara because such fractures are "often . . . never actually visualiz[ed]" due to "the complexity of the area." *Id.* Doctor O'Hara did, however, acknowledge that his opinion would be different if Plaintiff had a history mastoiditis in her left ear. *Id.* But, because he was unaware of any such history, Dr. O'Hara believed "to a reasonable degree of medical certainty" that Plaintiff suffered a basilar skull fracture. *Id.* at PageID.4108.

Defendants argue that this rationale is unreliable because it was "prepared solely for litigation." ECF No. 114 at PageID.9118. But as discussed above, Dr. O'Hara's opinion was formed during treatment. *See* discussion *supra* Section III.B.i.a.

Defendants also argue that Dr. O'Hara did not exercise sufficient "intellectual rigor" in forming his skull-fracture opinion because he formed it without "see[ing] any physical signs of a basilar skull fracture." ECF No. 114 at PageID.9118–19 (noting the lack of "blood in the ear canal" and largely normal findings from head examination). Defendants do not explain why Dr. O'Hara should have limited his review in this way or why his review of other physical evidence, such as "the fluid in the mastoid sinuses," was unreliable. ECF No. 43-4 at PageID.4070. Ultimately, it seems quite reasonable for a neurosurgeon like Dr. O'Hara to form new opinions based on new evidence.

Defendants also take issue with Dr. O'Hara's use of the term "supposition" to describe his skull-fracture opinion, which they associate with uncertainty. *See* ECF No. 114 at PageID.9115; ECF No. 43-4 at PageID.4104 (Q: Is there anything that is contained within these notes that references a possible fracture . . . ? A: No, No. I think I made it clear that that's—the basilar skull fracture is a supposition, and I have no direct, you know, evidence of one, based on the—both the several CAT scans, including bone windows, and the MRI scan.").

The term "supposition" means "something that is supposed" and is generally synonymous with the term "hypothesis." *See* Supposition, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/supposition [https://perma.cc/T69Q-M78P]. Here, Dr. O'Hara seems to have used the term to reflect his lack of visual evidence, not his lack of certainty. Indeed, immediately after using the term "supposition," Dr. O'Hara clarified that he held his skull-fracture opinion "to a reasonable degree of medical certainty." ECF No. 43-4 at PageID.4076. Of course, few attorneys would readily describe the opinion of their expert as a "supposition." But Dr. O'Hara was not an attorney or a retained expert, and his passing remark does not control the *Daubert* analysis.

Ultimately, Defendants' criticisms of Dr. O'Hara and his methodology go to the weight of his testimony, not its admissibility. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529–30 (6th Cir. 2008) ("The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation."). Therefore, their motion to limit the testimony of Dr. O'Hara will be denied.

**ii.**

Defendants next seek to exclude 11 categories of evidence. ECF No. 116. Each category is considered below.

**a.**

Defendants first seek to exclude any reference to standards formulated by the Clinical Laboratory Standards Institute (CLSI). ECF No. 116 at PageID.9422. The CLSI is a "not-for-profit membership organization" focused on "foster[ing] excellence in laboratory medicine by developing and implementing medical laboratory standards." ECF No. 115-10 at PageID.9367. The CLSI formulates its standards through a committee of medical experts, some of whom are employed by the Centers for Disease Control and the Food and Drug Administration. *Id.*; ECF No. 123-2 at PageID.9937. At least one of Plaintiff's experts has testified that Defendants were negligent for not collecting Plaintiff's capillary sample consistent with the relevant CLSI standards. *See* ECF No. 115-6 at PageID.9223.

Defendants argue that the CLSI standards are irrelevant because they only apply to medical laboratories, which BioLife does not operate. ECF No. 116 at PageID.9422. They also argue that the standards constitute inadmissible hearsay because "[P]laintiff is attempting to introduce [them] for their truth." *Id.* at PageID.9425. Defendants' arguments are unpersuasive.

First, even if the CLSI standards are designed for medical laboratories, they are still relevant to the issue of breach. As formulated by the Sixth Circuit, the issue of breach in this case is whether BioLife exercised "'reasonable care' while operating [its] [donation] center." *Good v. BioLife Plasma Servs., L.P.*, 834 F. App'x 188, 194 (6th Cir. 2020). That issue is ultimately one for the jury. *Id.* at 194. And at least one of Plaintiff's experts, Nancy Erickson, has testified that

- 16 -

Defendants should have been familiar with the CLSI procedures and followed them. Therefore, the CLSI standards are relevant to the issue of breach.

Second, the CLSI standards appear to fall within the learned-treatise exception to the rule against hearsay, which provides:

> (18) Statements in Learned Treatises, Periodicals, or Pamphlets. A statement contained in a treatise, periodical, or pamphlet if:
>> (A) the statement is called to the attention of an expert witness on cross-examination or relied on by the expert on direct examination; and
>> (B) the publication is established as a reliable authority by the expert's admission or testimony, by another expert's testimony, or by judicial notice.
> If admitted, the statement may be read into evidence but not received as an exhibit.

FED. R. EVID. 803(18).

Here, Erickson is expected to reference the CLSI standards and discuss their significance and authority at trial. *Id.* Moreover, the authors of the CLSI standards appear to "have no bias in any particular case . . . [and] are acutely aware that their material will be read and evaluated by others in their field." *United States v. Martinez*, 588 F.3d 301, 312 (6th Cir. 2009) (discussing learned-treatise exception); *see also Schneider v. Revici*, 817 F.2d 987, 991 (2d Cir. 1987) ("Learned treatises are considered trustworthy because 'they are written primarily for professionals and are subject to scrutiny and exposure for inaccuracy, with the reputation of the writer at stake.'" (quoting FED. R. EVID. 803(18) advisory committee's note on proposed rules)).

However, this Court need not decide at this juncture whether the learned-treatise exception applies. Rather, it is sufficient to note that Defendants have not shown that the CLSI standards are "clearly inadmissible on all potential grounds." *United States v. Phillips*, 146 F. Supp. 3d 837, 841 (E.D. Mich. 2015) (quoting *Ind. Ins. v. Gen. Elec. Co.*, 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004)). Accordingly, the final decision on the CLSI standards' admissibility will be made at trial. *See id.*

**b.**

Defendants next seek to exclude a video taken from the website of another plasma-donation center: CSL Plasma. ECF No. 116 at PageID.9425–26. According to Plaintiff, the video shows CSL Plasma using a "normal height, [non-]elevated" chair for the collection of capillary samples. ECF No. 123 at PageID.9911. Defendants claim that Plaintiff "mischaracterize[ed]" the video and that "there is no evidence as to what kind of chairs were used at CSL for capillary sampling." ECF No. 116 at PageID.9426. CSL Plasma employs one of Defendants' liability experts, Scott Smothers, and Plaintiff intends to use the video to impeach him. *Id.*

Plaintiff intends to elicit testimony from Smothers about the type of chairs used at CSL Plasma. *See* ECF No. 123 at PageID.9911. If Smothers testifies that CSL Plasma and BioLife used the same chairs, then he would likely be able to explain what the CSL Plasma video depicts and whether Plaintiff has, in fact, mischaracterized its content.

Accordingly, Defendants' motion to exclude the CSL video will be denied.

**c.**

Defendants next seek to exclude "any argument, suggestion, or inference that BioLife should have had Plaintiff seated in a phlebotomy chair." ECF No. 116 at PageID.9426 (emphasis omitted). Defendants' argument turns largely on their motion to exclude two of Plaintiff's liability experts, which has since been denied. *Good v. BioLife Plasma Servs., L.P.*, No. 1:18-CV-11260, 2022 WL 188125, at *1 (E.D. Mich. Jan. 19, 2022). Plaintiff's experts are expected to testify that, among other things, BioLife should have "seated [Plaintiff] in a low, three-armed, non-swiveling chair" with a BioLife employee "directly adjacent to [her]." *Id.* at *4. Plaintiff's experts are not, however, expected to testify that BioLife should have used a "phlebotomy chair." ECF No. 123 at PageID.9912 ("Tenley may offer evidence about chairs with 'third arms,' but she does not intend

to say that only a phlebotomy chair would work."). Accordingly, Defendants' motion will be denied.

**d.**

Defendants next seek to exclude any reference to Plaintiff as a "patient" of BioLife. ECF No. 116 at PageID.9427. Plaintiff does not oppose this request. *See* ECF No. 123 at PageID.9913. Accordingly, any reference to Plaintiff as a "patient" of BioLife will be excluded.

**e.**

Defendants next seek to exclude any reference to BioLife having a "policy" or "procedure" that required the person collecting the capillary sample to ask about prior adverse reactions. ECF No. 116 at PageID.9249. Plaintiff intends to call former BioLife employee Amy Parks, who previously testified that BioLife donors are "generally asked" about adverse reactions before the capillary sample. *See* ECF No. 123 at PageID.9114. Plaintiff has previously referred to this alleged practice as a "required procedure." *See* ECF No. 116 at PageID.9249. Defendants argue that characterizing Parks' testimony in this way is misleading because (1) Parks' testimony is not "binding" on Defendants, and (2) Parks lacked personal knowledge of the process given her limited job responsibilities. *Id.* at PageID.9430–31. Defendants also suggest that, even if Parks' testimony is admissible, the practice she describes cannot be fairly described as a "policy" or "procedure." *Id.* at PageID.9429.

Defendants' point regarding the term "policy" is well taken, but their broader challenge to Parks' testimony is unconvincing. Although insufficient to establish the existence of an official policy at BioLife, Parks's testimony would allow a reasonable juror to infer that, under ordinary circumstances, Plaintiff would have been asked about adverse reactions prior to her capillary sample. Whether that practice is characterized as an informal "process" or "procedure" seems

superfluous. Regardless of how it is characterized, such a practice would be relevant to whether Defendants acted reasonably.[4]

As for Parks's personal knowledge, she worked at BioLife for eight years and was able to describe the donation process in detail during her deposition. ECF No. 37-3 at PageID.2595–601. Accordingly, she appears competent to testify regarding BioLife's general practices. *See Smart & Assocs., LLC v. Indep. Liquor (NZ) Ltd.*, 226 F. Supp. 3d 828, 838 (W.D. Ky. 2016) ("When a witness has direct knowledge of normal company procedures in a specific situation, the witness will be considered to have personal knowledge of such procedures even if the witness was not directly involved in their application."). To the extent that Defendants continue to disagree, they may cross-examine Parks on the issue at trial and move to strike any pertinent testimony.

### f.

Defendants next seek to exclude any suggestion that Plaintiff suffered hearing loss due to her injury. ECF No. 116 at PageID.9432. They argue Plaintiff and her experts lack a reliable foundation to testify regarding the cause of her hearing loss. *Id.* Defendants also note that, according to their own expert, Plaintiff's hearing loss might have been caused by a prior ear infection. *Id.* at PageID.9432–33.

This Court agrees that Plaintiff is not competent to testify as to the cause of her hearing loss. The admissibility of lay opinion testimony is governed by Federal Rule of Evidence 701, which provides:

---

[4] To be clear, Parks's testimony is irrelevant to the issue of duty. The Sixth Circuit has already held that Defendants had a "duty to use 'reasonable care' while operating [its] [donation] center." *Good v. BioLife Plasma Servs., L.P.*, 834 F. App'x 188, 194 (6th Cir. 2020) (unpublished). And an institution's internal practices do not give rise to a legal duty. *See Buczkowski v. McKay*, 490 N.W.2d 330, 332 (Mich. 1992) (declining to impose "legal duty on a retailer on the basis of its internal policies" as contrary to public policy); *Zdrojewski v. Murphy*, 657 N.W.2d 721, 729 (Mich. Ct. App. 2002) ("[The] internal policies of an institution, including a hospital, cannot be used to establish a legal duty in a negligence claim.").

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
> (a) rationally based on the witness's perception;
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
> (c) not based on scientific, technical or other specialized knowledge within the scope of Rule 702.

FED. R. EVID. 701.

Rule 701 thus requires trial courts to distinguish between testimony that is "rationally based on the witness's perception" and testimony that requires "scientific, technical, or other specialized knowledge." *Id.* Although this inquiry is highly fact specific, certain trends have emerged in cases where, as here, the plaintiff alleges a medically diagnosable injury. In such cases, the plaintiff may typically testify regarding her symptoms but not regarding the underlying medical diagnosis. *See Williams v. Hamilton Cnty.*, No. 1:15-CV-74, 2018 WL 1586234, at *2 (E.D. Tenn. Mar. 31, 2018) (collecting cases). Similarly, the plaintiff may testify regarding causation if "[it] is within a lay person's realm of knowledge," but not if "there are multiple possible causes of [the] injury or where specialized medical issues are involved." *Id.* (collecting cases).

Here, Plaintiff may testify regarding the nature, timing, and extent of her hearing loss, as these issues are clearly within her perception. *See id.* But she may not testify regarding the cause of the hearing loss, given the competing explanations. *Id.*

Defendants' challenge to Plaintiff's experts, however, is without support. As previously discussed, Dr. O'Hara reliably testified that Plaintiff's hearing loss was the result of her injury. *See* discussion *supra* Section III.B.i. And, as discussed *infra*, Dr. O'Hara's opinion is supported by the opinion of Plaintiff's otolaryngologist, Dr. Katherine Heidenreich. Further, both experts are competent to testify regarding the cause of Plaintiff's hearing loss.

Defendants' expert's testimony does not alter the analysis. Defendants' expert, Dr. John Wald, merely presents a different medical conclusion. And, again, it is the province of the jury, not the court, to decide which conclusion is most credible. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529–30 (6th Cir. 2008) ("The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation.").

Accordingly, Plaintiff may testify to the timing, nature, and extent of her hearing loss, but she may not testify to its cause, unlike her experts.

### g.

Defendants next seek to exclude testimony and records from Dr. Katherine Heidenreich, an otolaryngologist who began seeing Plaintiff in September 2019 for hearing loss. ECF No. 116 at PageID.9435. During Plaintiff's September 2019 visit, Dr. Heidenreich diagnosed her with "[l]eft posttraumatic conductive hearing loss, autophony, and sound sensitivity." ECF No. 116-14 at PageID.9669. Doctor Heidenreich also noted that Plaintiff might have "superior semicircular canal dehiscence" (SSCD),[5] based on one of the scans from 2016, but she clarified that "a formal diagnosis" would require additional testing. *Id.* Plaintiff apparently declined that testing because she was uninterested in eventual "surgical treatment." *Id.* Doctor Heidenreich recommended that Plaintiff return in one year with an updated audiogram. *Id.* Plaintiff did not disclose Dr. Heidenreich as an expert witness and, therefore, intends to call her to testify in her capacity as a treating physician. *See* ECF No. 123 at PageID.9919.

---

[5] SSCD "is an opening in the bone that covers the superior semicircular canal of the inner ear" and can "cause trouble with a person's balance and hearing." *See Superior Canal Dehiscence*, Cleveland Clinic (Mar. 13, 2018), https://my.clevelandclinic.org/health/diseases/15266-superior-canal-dehiscence-scd [https://perma.cc/9AK4-B5QQ].

Because Plaintiff first visited Dr. Heidenreich in September 2019, after the close of discovery, Defendants accuse Plaintiff of "attempt[ing] to reengineer her case" and evade this Court's discovery deadlines. ECF No. 116 at PageID.9436. Defendants also contend that Dr. Heidenreich's testimony lacks a reliable basis, and that Dr. Heidenreich "made no diagnosis and provided no treatment." *Id.* at PageID.9438–39. Defendants add that Plaintiff's statements in Dr. Heidenreich's records are inadmissible hearsay. *Id.* at PageID.9439.

Since initially responding to Defendants' omnibus motion in limine, Plaintiff has filed a motion to supplement her response with new information. ECF No. 138. In July 2021, Plaintiff returned to Dr. Heidenreich with an updated audiogram, showing relatively stable hearing loss since 2016. ECF No. 138-2 at PageID.10456–58. As a result, Dr. Heidenreich recommended a hearing aid. *Id.* at PageID.10456.

Defendants oppose Plaintiff's motion to supplement. They argue that it raises issues "that were already argued" and therefore would not aid this Court in resolving Defendants' omnibus motion. ECF No. 139 at PageID.10534–35.

Defendants' arguments against both Dr. Heidenreich and Plaintiff's motion to supplement are unpersuasive.

First, there is no evidence that Plaintiff's visit to Dr. Heidenreich was an improper attempt to "reengineer her case." ECF No. 116 at PageID.9436. Plaintiff first visited the University of Michigan Medical Center, where Dr. Heidenreich works, in 2016, and her provider during that visit expressly noted the possibility of future visits. *See* ECF No. 123-4 at PageID.9980 ("I will see the patient back for follow up as needed."). And though Plaintiff stated in her November 2018 deposition that she had no plans to see "any other" providers, ECF No. 116 at PageID.9435, she should not be punished for returning to the *same* medical center the following year for additional

treatment and consultation. To the extent that Defendants find the timing of her visit to Dr. Heidenreich suspicious, they may explore the circumstances of the visit on cross-examination.

Second, there is no reason to believe that Dr. Heidenreich, as Defendants suggest, merely "speculated" about Plaintiff having SSCD. *Id.* at PageID.9437–38. Doctor Heidenreich based her diagnostic impression on her review of Plaintiff's medical records, including her post-injury testing. *See* ECF No. 116-14 at PageID.9669. And Defendants have not explained why that review was unreliable.

Third, Defendants' contention that Dr. Heidenreich "made no diagnosis" and "provided no treatment" is unsupported by the record. ECF No. 116 at PageID.9439. Doctor Heidenreich diagnosed Plaintiff with "[l]eft posttraumatic conductive hearing loss, autophony, and sound sensitivity." ECF No. 116-14 at PageID.9669. It is patently unclear why, according to Defendants, she may not testify about those diagnoses, her rationale for them, or why she believes that Plaintiff suffers from SSCD.

Fourth, Plaintiff has shown good cause to file her supplemental response. Courts may grant parties leave to file a supplemental response "in the interests of justice when the proposed submission contains 'new authority or evidence that was not available [to the movant] in the exercise of reasonable diligence' when the original briefs were filed." *Valassis Commc'ns, Inc. v. News Corp.*, No. 13-14654, 2015 WL 13050049, at *1 (E.D. Mich. Dec. 23, 2015) (quoting *Harshaw v. Bethany Christian Servs.*, No. 1:08-CV-104, 2010 WL 610262, at *1 (W.D. Mich. Feb. 19, 2010)). As explained above, Plaintiff's supplemental response contains new information about a visit to Dr. Heidenreich in July 2021 that evidently supports her position.

Finally, Plaintiff's statements to Dr. Heidenreich, reflected in her treatment records, are not inadmissible hearsay. Defendants specifically challenge the statement in Dr. Heidenreich's

- 24 -

records that "[Plaintiff] was told she likely had a basilar skull fracture." ECF No. 116 at PageID.9439. Under Federal Rule of Evidence 803, a hearsay statement is not inadmissible if it "(A) is made for—and is reasonably pertinent to—medical diagnosis or treatment; and (B) describes medical history; past or present symptoms or sensations; their inception; or their general cause." FED. R. EVID. 803(4). Here, both (1) the statement from the unnamed provider to Plaintiff that she "likely had a basilar skull fracture" and (2) Plaintiff's repetition of that statement to Dr. Heidenreich constitute hearsay. *See Back v. Nestlé USA, Inc.*, 694 F.3d 571, 577 n.1 (6th Cir. 2012) (defining hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"). Yet both statements were made for "medical diagnosis or treatment" and "describ[e] [Plaintiff's] medical history" and the "general cause" of her symptoms. *Id.* Therefore, both statements are admissible under Rule 803(4).

For these reasons, Defendants' request to exclude Dr. Heidenreich will be denied.

### h.

Defendants next seek to exclude any reference to Plaintiff having suffered a personality change because of her injury. ECF No. 116 at PageID.9439. Plaintiff intends to introduce three categories of personality evidence: (1) expert testimony from neuropsychologists who examined her and reported depression, anxiety, and a "reserved" demeanor, (2) lay testimony from herself, and (3) lay testimony from family members who have observed changes such as increased irritability, "overwhelming anxiety," and "borderline agoraphobia." ECF No. 123 at PageID.9922–25. Defendants contend that none of these witnesses can competently link Plaintiff's injury to a change in her personality. ECF No. 132 at PageID.1057–59. Defendants also emphasize that their own expert, Dr. Wald, has opined that "[t]here is no documented pathology that suggests a physiological explanation for her reported personality changes." *Id.* at PageID.10259.

As with Plaintiff's hearing loss, Plaintiff and her family members may testify to any changes in Plaintiff's personality that they have direct experience with. *See* FED. R. EVID. 701; *Williams v. Hamilton Cnty.*, No. 1:15-CV-74, 2018 WL 1586234, at *2 (E.D. Tenn. Mar. 31, 2018) (noting that lay witnesses may testify regarding symptomology); *cf. Rees v. Target Corp.*, No. 06-10676, 2008 WL 7440009, at *2 (E.D. Mich. Mar. 31, 2008) (permitting plaintiff and family members to testify to personality changes allegedly stemming from head injury). They may not, however, testify to the cause of those injuries. *See Williams*, 2018 WL 1586234, at *2.

Plaintiffs' experts, on the other hand, may testify to the cause of Plaintiff's injury if can provide a foundation for their testimony. Given their education, training, and experience, Plaintiff's neuropsychologists are likely capable of explaining how a traumatic brain injury can cause personality changes. But based on the current record, it is unclear whether either side has ever asked them for an explanation.

 Accordingly, Defendants' request to exclude any reference to Plaintiff's personality changes will be denied. But Defendants may examine Plaintiff's neurologists at trial as to the basis of their opinions and, if appropriate, renew their request for exclusion.

**i.**

Defendants next seek to exclude evidence regarding the standard of care "until Plaintiff introduces evidence establishing a relationship giving rise to a duty." ECF No. 116 at PageID.9940 (emphasis omitted). Defendants claim that "the [Sixth Circuit] failed to identify the relationship" giving rise to Defendants' legal duty, and that without evidence of a specific relationship, the appropriate standard of care is effectively unknowable. *See id.* at PageID.9442.

Defendants' initial premise—that the Sixth Circuit "failed to identify [a] relationship"—is mistaken. The relationship that the Sixth Circuit identified was that between a donation-center

operator (BioLife) and one of its donors (Plaintiff); hence the Sixth Circuit's conclusion that BioLife had a "duty to use 'reasonable care' while operating th[e] center." *Good v. BioLife Plasma Servs., L.P.*, 834 F. App'x 188, 194 (6th Cir. 2020); *see also id.* at 195 (considering "the relationship of the parties, [and] the foreseeability of the harm," and concluding that "BioLife was in a better position than Good to understand the risks of plasma donation and protect against those risks").

Defendants might be disappointed with that holding insofar as it leaves the contours of "reasonable care" in the hands of the jury. *See id.* ("The terms 'ordinary care,' 'reasonable prudence,' and such like terms . . . cannot be arbitrarily defined . . . . The policy of the law has relegated the determination of such questions to the jury." (quoting *Case v. Consumers Power Co.*, 615 N.W.2d 17, 21 (Mich. 2000))). But Defendants may not disregard that holding by arguing, as they apparently intend to do at trial, that they owed no duty to Plaintiff whatsoever.

Accordingly, Defendants' request to limit Plaintiff's presentation of evidence on the standard of care will be denied.

### j.

Defendants next seek to exclude any reference to "other incidents or cases filed by other plaintiffs alleging injury due to losing consciousness or falling at BioLife." ECF No. 116 at PageID.9443. Defendants have filed declarations from two BioLife employees who state that they are unaware of any similar instance in which a donor "los[t] consciousness in the screening area" or "f[ell] from a chair in the screening area." ECF Nos. 116-15 at PageID.9671; 116-16 at PageID.9674.

For evidence of a prior accident to be admissible in a negligence action, the prior accident "must [have] be[en] 'substantially similar' to the one at issue." *Croskey v. BMW of N. Am., Inc.*,

532 F.3d 511, 518 (6th Cir. 2008) (quoting *Koloda v. Gen. Motors Parts Div., Gen. Motors Corp.,* 716 F.2d 373, 376 (6th Cir. 1983)). "Substantial similarity means that the accidents must have occurred under similar circumstances or share the same cause." *Id.*

Yet Plaintiff does not intend to introduce evidence of a "prior accident," strictly construed. Rather, she "merely wants to discuss adverse reactions that result from blood extraction in BioLife's plasma-donation center." ECF No. 123 at PageID.9928. By "adverse reactions," Plaintiff is presumably referring to incidents in which BioLife donors became "dizzy" or "lightheaded" during the donation process, which the Sixth Circuit cited in its discussion of Plaintiff's negligent-positioning theory. *See Good*, 834 F. App'x at 197.

To the extent that Plaintiff seeks to elicit testimony regarding adverse reactions to show notice, Plaintiff is correct that she need not demonstrate a "perfect congruence" between her injury and the prior incidents. *See* ECF No. 123 at PageID.9928. Indeed, the Sixth Circuit has long held that the relevance of prior-incident evidence "depend[s] not only on the character of the evidence itself but on the purpose for which it is offered." *Koloda*, 716 F.2d at 375. And some courts have held that "a lesser degree of similarity is required" if the prior accident is offered only to prove notice. *See, e.g.*, *Cervelli v. Thompson/Ctr. Arms*, No. C2-99-1409, 2002 WL 193577, at *3 (S.D. Ohio Jan. 28, 2002) (citing *Bryan v. Emerson Elec. Co.*, 856 F.2d 192 (6th Cir. 1988) (unpublished table decision)).

Here, Plaintiff apparently intends to show that Defendants should have known that adverse reactions, like fainting, were possible because of instances in which other donors became dizzy or lightheaded during the screening process. *See* ECF No. 123 at PageID.9928. Plaintiff's incident was, of course, more extreme than a dizzy spell. But her incident and the prior incidents seem similar enough for a reasonable juror to infer that Defendants should have known about the

potential for fainting. At the very least, Defendants have not shown that such evidence is "clearly inadmissible on all potential grounds." *United States v. Phillips*, 146 F. Supp. 3d 837, 841 (E.D. Mich. 2015).

Accordingly, Defendants' request to exclude any reference to other incidents will be denied.

## k.

Defendants finally seek to exclude evidence of the parties' finances. ECF No. 116 at PageID.9445. Plaintiff does not oppose this request. ECF No. 123 at PageID.9930. Accordingly, any reference to the parties' finances will be excluded.

## IV.

Accordingly:

1. Plaintiff's Motion to Allow for a Court Reporter to Record and Display Certain Portions of Testimony, ECF No. 111, is **DENIED**.

2. Plaintiff's Motion to Allow for Deposition, Video, and Videoconferencing Testimony During Trial, ECF No. 112, is **GRANTED IN PART** and **DENIED IN PART**.

   a. Plaintiff's Motion is **GRANTED** as to Dr. Thomas O'Hara and Dr. Katherine Heidenreich.

   b. Plaintiff's Motion is **DENIED** as to the remaining witnesses.

3. Plaintiff's Motion to Require Defendants to Produce Employees at Trial, ECF No. 113, is **DENIED AS MOOT**.

4. Plaintiff's Motion to File Supplemental Response, ECF No. 138, is **GRANTED**.

5. Defendants' Motion to Limit the Testimony of Dr. O'Hara, ECF No. 114, is **DENIED**.

6. Defendants' Omnibus Motion in Limine, ECF No. 116, is **GRANTED IN PART** and **DENIED IN PART**.

    a. Defendants' Motion is **GRANTED** as to the request to exclude (1) any reference to Plaintiff as a "patient" of BioLife, (2) any lay testimony regarding the cause of Plaintiff's alleged hearing loss or personality changes, and (3) any reference to the parties' finances.

    b. Defendants' Motion is **DENIED** in all other respects.

It is **SO ORDERED.**

Dated: June 3, 2022                     s/Thomas L. Ludington
                                             THOMAS L. LUDINGTON
                                             United States District Judge