UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

TENLEY MCLAUGHLIN GOOD,

        Plaintiff,                        Case No. 1:18-cv-11260

v.                                        Honorable Thomas L. Ludington
                                            United States District Judge

BIOLIFE PLASMA SERVICES, L.P.,

        Defendant.
_____/

**ORDER DENYING PLAINTIFF'S MOTION FOR JUDGMENT AS A MATTER OF LAW AND FOR A NEW TRIAL**

        Since she was a child, Plaintiff Tenley McLaughlin Good has fainted at the sight of blood. Yet in October 2015, after her mother cautioned her against it, Plaintiff walked into a BioLife Plasma Services Center in Mount Pleasant, Michigan to donate plasma. When one of BioLife's employees pricked Plaintiff's finger, Plaintiff saw her own blood, fainted, fell out of a swivel chair, and hit her head. Plaintiff sued BioLife for negligence, and BioLife asserted a comparative-negligence defense.

        After an eight-day trial, the jury returned a verdict finding Defendant negligent. But the jury found Plaintiff negligent, too. Accordingly, the jury allocated 20% of fault to Defendant, and 80% to Plaintiff. Plaintiff now challenges the jury's verdict, claiming its allocation of fault is flawed as a matter of law and that she is entitled to a new trial because the verdict was against the weight of the evidence. She also asserts three jurors were biased.

I.

A.

In October 2015, Plaintiff Tenley McLaughlin Good decided she wanted to donate plasma. *See Good v. Biolife Plasma Servs., L.P.*, No. 18-11260, 2020 WL 736005, at *3 (E.D. Mich. Feb. 13, 2020). The night before Plaintiff's donation, her mother told her to "make sure" the donation center knew she was "not great" with blood. *Id.* Indeed, Plaintiff had a history of fainting at the sight of blood and had fainted while attempting to donate blood in the past. *Id.* at *1. Nonetheless, the next day, she went to a plasma donation center operated by Defendant BioLife Plasma Services in Mount Pleasant, Michigan, to donate plasma. *Id.* at *3.

After arriving at BioLife, Plaintiff was instructed to sit in a swivel chair at an elevated counter across from BioLife employee, Sylvia Roberts. *Id.* While Roberts was questioning Plaintiff, Roberts pricked Plaintiff's finger to collect a blood-capillary sample, and Plaintiff fainted within seconds. *Id.* at *3–4. Roberts tried to hold Plaintiff upright from across the counter, but Plaintiff fell to the ground. *Id.* Roberts was injured while attempting to prevent Plaintiff's head from hitting the floor and was subsequently placed on disability as a result of her injuries. *Id.* at *4. Plaintiff spent a week in the hospital with postconcussive symptoms and alleges she suffered hearing loss and personality changes. *Id*.

In March 2018, Plaintiff sued BioLife and its parent company,[1] advancing two theories of liability for Plaintiff's injury.[2] First, she claimed Defendants negligently failed to take her medical history before collecting her capillary sample. *See id*. If they would have collected her complete

---

[1] Fifteen days before trial, the Parties stipulated to dismiss BioLife's parent company, Shire US, Inc., from the case without prejudice. ECF No. 173.
[2] Plaintiff also sued for medical malpractice but later stipulated to dismiss it. *See* ECF Nos. 1 at PageID.11; 28.

- 2 -

medical history, she argued, then they would have learned what she knew: that she had a history of fainting at the sight of blood. *See* ECF No. 37 at PageID.2527–28. Second, she claimed Defendants negligently positioned her in an elevated swivel chair too far from Roberts to prevent her fall. *See Good*, 2020 WL 736005, at *4, *7.

In August 2019, the parties filed cross-motions for summary judgment. ECF Nos. 32; 37. After carefully reviewing the record, this Court granted summary judgment for Defendants. *Good*, 2020 WL 736005, at *8. The problem with Plaintiff's negligent-history theory, in this Court's view, was a lack of evidence that Defendants failed to take her medical history. *Id.* at *6. Roberts testified that she took Plaintiff's medical history during a vein check[3] and Plaintiff testified at a deposition that she did not remember the vein check. *Id.* Notably, however, Plaintiff later furnished an affidavit asserting that she did, in fact, recall *not* being asked about her history. *Id.*

This Court gave little weight to Plaintiff's later affidavit because it contradicted her earlier deposition testimony that she could not remember the vein check. *Id.* Additionally, the Parties' expert reports substantiated Defendants' assertion that the statistical probability of Plaintiff fainting from a capillary sample was "so unlikely that failing to anticipate it was [not] a breach of the standard of care" as a matter of law. *Id.* at *8.

But the Sixth Circuit saw things differently. Regarding the negligent-history theory, the Sixth Circuit found no "direct contradiction," between Plaintiff's deposition testimony and her latter affidavit, leaving a triable question of fact instead. *Good v. BioLife Plasma Servs., L.P.*, 834 F. App'x 188, 196 (6th Cir. 2020) (unpublished). With respect to negligent positioning, the Sixth

---

[3] During a "vein check," a BioLife employee examines a potential donor's veins to verify whether their blood is suitable to donate. *See Good v. Biolife Plasma Servs., L.P.*, No. 18-11260, 2020 WL 736005, at *2 (E.D. Mich. Feb. 13, 2020). BioLife records reflect that Julida Reeves performed Plaintiff's vein check and testified that she would regularly ask the donor about prior adverse reactions. *Id.*

Circuit concluded that, though "small," the risk of fainting from a capillary-sample collection was "foreseeable" because "BioLife sees around 100,000 donors every year." *Id.* at 196–97. Therefore, it held, a reasonable juror could find BioLife negligent for providing Plaintiff with a swivel chair rather than safer furniture. *Id.* at 198.

The Sixth Circuit also addressed causation because Defendants raised it as an alternative basis for affirming summary judgment. *Id.* Based on the expert reports and Roberts's testimony with respect to the swivel chair, the Sixth Circuit concluded that jurors could, and should, determine whether the lack of a safer chair was the but-for cause of Plaintiff's injuries. *Id.* at 198–99. In sum, the Sixth Circuit reversed summary judgment for Defendants and remanded the case for further proceedings. *Id.* at 200.

**B.**

A jury-trial began on March 30, 2023. *See* ECF No. 171. Before selecting jurors, this Court provided the pool of potential jurors a brief summary of the case, Plaintiff's two theories of negligence, and Defendant's theory of comparative negligence. Counsel for both Parties introduced themselves and identified the witnesses they planned to call during trial.

Then, 14 people were randomly selected to sit in the jury box for *voir dire*. Each of the 14 people selected introduced themselves and told the Court about their employment, education, family, relationships, memberships, and any subscriptions they held. This Court then inquired whether any jurors knew the Parties or identified witnesses, and whether anyhad been part of a civil case before. Among other questions, this Court also asked jurors if anyone had ever donated blood or plasma, to which a handful of jurors answered that they had.

Following this Court's questions, Plaintiff's Counsel introduced himself and began his *voir dire* questioning. A few minutes into his *voir dire*, he posed the following question to the juror pool:

> Do any of you feel that if somebody has this tendency, that they don't like blood, they don't like needles, they get lightheaded, they pass out, they feel dizzy, they have vertigo, that they should never try to donate either blood or plasma? Any of you feel that way?

ECF No. 211 (sealed) at PageID.12244.

Several vocal jurors responded at nearly the same time that they did feel that way. A few minutes later, Plaintiff's Counsel approached the bench and, at sidebar, asked that the jurors who answered affirmatively be excused for cause. This Court responded that Plaintiff's Counsel had "set up a hypothetical set of facts" and received an "advisory opinion from the jury" on those facts, and concluded that it "didn't mean that they're biased," but that it was "analytically the conclusion that [the jurors] reach on those facts." After he further questioned the juror pool through *voir dire*, Plaintiff requested that Jurors 4, 7, 8, 9, 10, 12, 13, and 14 be excused for cause. *Id.* at PageID.12270. According to Plaintiff, his request was "on the basis of their position that [Plaintiff] should have never walked in the door, even with the question as part of the process it wouldn't change their thoughts on that and they would not be able to sit and listen to all the evidence and come to a fair determination." *Id.* Defendant objected, arguing it was not a basis for cause. This Court decided that Plaintiff's Counsel's question—which was not included in the Requested Voir Dire submitted by Plaintiff's Counsel to this Court before trial—did not raise a question of comparative fault between the *Parties*, but merely asked the jury pool whether they would avoid the risk of a likely injury. A handful of jurors were excused and replaced for a variety of other reasons, and the jury was impaneled. Importantly, the only impaneled juror Plaintiff's Counsel requested to remove for cause was Juror 8. But Juror 8 never expressed that she would not be able

- 5 -

to sit and listen to all the evidence before coming to a conclusion. Plaintiff's Counsel exercised two preemptory challenges but not his third.

C.

After eight days of trial, the jury found that Defendant was 20% negligent and that Plaintiff was 80% negligent. ECF No. 191 at PageID.11716 (citing ECF No. 190 at PageID.11711–13). The jury determined that Plaintiff was entitled to $24,713.00 in economic damages, but her award was reduced by 80% to $4,942.60[4] according to Michigan's comparative-negligence law. ECF No. 191 at PageID.11716; *see also* MICH. COMP. LAWS § 600.2959.

Now, Plaintiff challenges the jury's finding of comparative negligence as a matter of law or, alternatively, requests a new trial because she alleges three impaneled jurors were biased against her. ECF No. 194. First, she argues that "no reasonable juror could have concluded that Defendant . . . carried its burden to establish that [Plaintiff] was comparatively negligen[t]," and requests judgment as a matter of law in her favor under Civil Rule 50(b) and a new trial to determine noneconomic damages. *Id.* at PageID.11743. Second, she argues that two jurors "revealed predetermined opinions that [Plaintiff] was negligent" which "irreparably tainted the jury's verdict on comparative negligence," so she is entitled to a new trial under Civil Rule 59(a). *Id.* at PageID.11742. Alternatively, she requests a new trial on all issues. *Id.* Defendant responds that the jury's verdict was reasonable and supported by the evidence, and that there was no juror bias. *See* ECF No. 213.

---

[4] Two months later, the Parties agreed to amend the judgment to include pre- and post-judgment interest, ECF No. 209, and an amended judgment was issued awarding Plaintiff "pre- and post-judgment interest totaling $1,000.00," ECF No. 210.

II.

A.

When a party seeks judgment as a matter of law under Civil Rule 50(b), federal courts sitting in diversity "use the standards for a judgment as a matter of law applicable under the law of the forum state." *Ventas, Inc. v. HCP, Inc.*, 647 F.3d 291, 319 (6th Cir. 2011) (internal quotations omitted). Here, Michigan law governs, so the evidence must be construed "in the light most favorable to the nonmoving party." *Elezovic v. Ford Motor Co.*, 697 N.W.2d 851, 857 (Mich. 2005). And a directed verdict may be granted only if, after viewing all the evidence in the light most favorable to the party opposing the directed verdict, reasonable minds could not differ on any question of material fact. *Caldwell v. Fox*, 231 N.W.2d 46, 49 (Mich. 1975).

B.

Plaintiff asserts that "[n]o reasonable person" could have concluded that Defendant carried its burden at trial to establish comparative negligence, relying almost exclusively on testimony from Katie Pietrzak, Defendant's corporate representative. ECF No. 194 at PageID.11760. In response to a question framed by Plaintiff's Counsel, Pietrzak said she was "not saying" what happened to Plaintiff was her fault. *Id.* at PageID.11761. According to Plaintiff, Pietrzak's testimony was a "judicial admission" that should have foreclosed any allocation of fault to Plaintiff. *Id.* Defendant responds that Pietrzak's testimony was *not* a judicial admission and there was "ample evidence" of Plaintiff's own negligence to support the jury's comparative-negligence verdict. ECF No. 213 at PageID.12308–09.

1.

"Judicial admissions are 'formal admissions in the pleadings which have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of that fact.'" *Brown*

*v. Bassett Used Cars LLC*, No. 22-11106, 2023 WL 5125180, at *3 (E.D. Mich. Aug. 8, 2023) (quoting *In re Kattouah*, 452 B.R.604, 608 (E.D. Mich. 2011)). For a statement to be a judicial admission, it must be "deliberate, clear, and unambiguous," and must "amount to an express concession of a fact." *In re Kattouah*, 452 B.R. 604, 608 (E.D. Mich. 2011). In the Sixth Circuit, the discussion of judicial admissions has been limited to admissions *by counsel*, though at least one other circuit has held that a party's own testimony may be a judicial admission. *See Jonibach Mgmt. Tr. v. Wartburg Enterprises, Inc.*, 750 F.3d 486, 492 n.2 (5th Cir. 2014).

At trial, Defendant called Pietrzak—the "center manager" of the BioLife facility Plaintiff visited—as a witness. ECF No. 202 at PageID.12019. Although Pietrzak was not a "corporate representative" under Civil Rule 30(b)(6), she was "designated as BioLife's corporate representative at trial and sat at counsel table." ECF No. 213 at PageID.12312. Plaintiff asserts that the following trial testimony by Pietrzak is a judicial admission:

> **Plaintiff's Counsel:** You are not saying that what happened to [Plaintiff] is [Plaintiff's] fault, are you?
>
> **Ms. Pietrzak**: No.
>
> **Plaintiff's Counsel**: You're not blaming her at all, in any respect, for what happened to her at BioLife on October 8, 2015, are you?
>
> **Ms. Pietrzak**: No.
>
> **Plaintiff's Counsel**: Other than your lawyers, you're not aware of anybody who is blaming [Plaintiff] for the incident at BioLife on October 8th, 2015, are you?
>
> **Defendant's Counsel**: Objection. That's argumentative and –
>
> **The Court**: Sustained.
>
> **Defendant's Counsel**: -- inaccurate.
>
> **Plaintiff's Counsel**: Your Honor, I'm asking for an admission from the representative of BioLife that's in this courtroom whether or not the company is blaming [Plaintiff] for anything related to the incident in 2015.

> **The Court**: It's a jury question, and you'll have an opportunity to make your argument here shortly in closing.

ECF No. 202 at PageID.12033–34.

Even *assuming* a statement made by a party's corporate representative at trial can be a judicial admission, Plaintiff's Counsel's questions regarding whether the incident was Plaintiff's "fault" was, as this Court noted, the disputed question for the jury, and not merely the concession of a discrete *fact*. *See In re Kattouah*, 452 B.R. 604, 608 (E.D. Mich. 2011). Indeed, determinations of fault, "negligence[,] and proximate causation require the application of rules of law to complex factual patterns. Judicial admissions, in contrast, typically concern only matters of *fact*." *MacDonald v. Gen. Motors Corp.*, 110 F.3d 337, 341 (6th Cir. 1997) (emphasis added). Accordingly, Pietrzak's testimony is not a judicial admission that foreclosed any allocation of fault to Plaintiff.

### 2.

Plaintiff next argues that even if Pietrzak's testimony was not a judicial admission, "the [trial] record lacks any other substantiated evidence of comparative negligence." ECF No. 194 at PageID.11763. According to Plaintiff, "Pietrzak never offered anything from which a juror could reasonably *infer* comparative negligence." *Id.* at PageID.11761. But the jury was presented with much more than Pietrzak's testimony.

In Michigan, "[c]omparative negligence is an affirmative defense." *Kalamazoo Oil Co. v. Boerman*, 618 N.W.2d 66, 70 (Mich. Ct. App. 2000) (citing *Riddle v. McLouth Steel Prods.*, 485 N.W.2d 676, 682 (Mich. 1992)). If a defendant proves that a plaintiff was negligent, the "plaintiff's recovery of damages is reduced to the extent that plaintiff's negligence contributed to the injury." *Id.*; *see also* MICH. CIV. JI 11.01 Comparative Negligence—Definition (explaining "[t]he total

amount of damages that the plaintiff would otherwise be entitled to recover shall be reduced by the percentage of plaintiff's negligence that contributed as a proximate cause to [her] injury"). If a defendant presents a comparative-negligence defense at trial, "[t]he defendant has the burden of proof on [its] claim that the plaintiff was negligent in one or more ways claimed by the defendant . . . and that such negligence was a proximate cause of" the injuries to the plaintiff. MICH. CIV. JI 16.02A Burden of Proof in Negligence Cases. Importantly, it is "the duty of the plaintiff, in connection with this occurrence, to use ordinary care for her own safety."[5] Mich. Civ. JI 10.04 Duty to Use Ordinary Care—Adult—Plaintiff.

Considering all evidence presented at trial, it was reasonable for the jury to conclude that Plaintiff did not use "ordinary care for her own safety" such that she was comparatively negligent and 80% at fault. True, Plaintiff testified that nobody at BioLife asked her about her donation history or whether she had any problems with blood, ECF No. 198 at PageID.11840, and that she would have told Defendant's employees about her prior blood-donation experiences if they had asked, *id.* at PageID.11843. She also testified that she never had a vein check, *id.* at PageID.11842, that the medical historian, Sylvia Roberts, asked to see her hands, and then pricked her finger with the lancet without warning, and that she did not remember if Roberts wiped her finger with an antiseptic solution before pricking it. *See* ECF Nos. 198 at PageID.11848; 199 at PageID.11858. But she also testified that she had previously passed out during a finger prick, ECF No. 198 at

---

[5] Plaintiff argues that a comparative-negligence defense may not be invoked unless the defendant "provide[s] 'proof of a duty' that the plaintiff owes" the *defendant*. ECF No. 194 at PageID.11759 (quoting *Romain v. Frankenmuth Mut. Ins. Co.*, 762 N.W.2d 911, 913 (Mich. 2009). But Plaintiff takes the language in *Romain* out of context. *Romain* specifically addressed comparative fault under Mich. Com. Laws §§ 600.2957 and 600.6304, which address the comparative fault for other defendants and nonparties. But the relevant Michigan law governing the comparative fault of the *injured party bringing suit* can be found in Mich. Comp. Laws. §§ 600.2958 and 600.2959, neither of which are addressed in *Romain*. Quite simply, *Romain* addresses the duty owed by other defendants or nonparties *to the plaintiff*. Accordingly, it does not apply here.

PageID.11816, and that she "had a conversation with [her] mother" the night before she went to donate plasma and her mother said she didn't think donating plasma was a good idea because Plaintiff didn't "do well with" blood donations, *id.* at PageID.11832. She also testified that she did not tell anyone about her previous blood-donation experiences because she "assumed" Defendant's employees would ask her about it. *Id.* at PageID.11834.

Importantly, the jury also considered evidence that contradicted Plaintiff's testimony that she was never asked her about her donation history. The jury considered Plaintiff's BioLife records, which reflected that Julida Reeves, Defendant's Center Supervisor in 2015, checked Plaintiff's veins. *See* ECF Nos. 202 at PageID.11993; 204 at PageID.12099. Indeed, Reeves testified that although she did not remember Plaintiff specifically, ECF No. 204 at PageID.12095–96, 12105, she was confident that if she initialed Plaintiff's records, she did a vein check, which would have included asking Plaintiff whether she had ever donated blood or plasma before "because it is [her] habit to do it, and [she] ask[s] that question every time." *Id.* at PageID.12117; *see also id.* at PageID.12106 ("I did the same thing every single time.").

And the jury heard testimony from Elizabeth Stahl, a nurse at Defendant's Mount Pleasant location. She testified that new donors were asked about their donation history at the vein check, and that any new donors who disclosed a history of adverse reactions or fear of needles were referred to her. ECF No. 205 at PageID.12141. She further testified that if Plaintiff was not referred to her, it would mean either (1) that the new donor did not disclose any adverse reactions or concerns during the vein check that would require her involvement; or (2) the new donor was not asked about their donation history. ECF No. 206 at PageID.12154.

Plaintiff asserts there was "no documented *credible* evidence" that showed Defendant's employees asked about Plaintiff's prior donation history. ECF No. 194 at PageID.11764 (emphasis

- 11 -

added). But a reasonable juror—after considering Plaintiff's testimony, her BioLife record, and the testimony of BioLife employees—could reasonably conclude that Defendant's employees asked Plaintiff about her donation history. And even without such a conclusion, a reasonable juror could still conclude, in light of Plaintiff's testimony and history, that she did not use ordinary care by choosing not to disclose her history of adverse reactions to the sight of blood earlier in the donation process.

In sum, construing the evidentiary record in Defendant's favor as required, reasonable jurors could—and did—conclude that Plaintiff was comparatively negligent, such that she was 80% at fault for her injuries.

### III.

#### A.

Under Civil Rule 59(a)(1)(A) courts "may, on motion, grant a new trial on all or some of the issues—and to any party . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "The language of Rule 59(a) has been interpreted to mean that a new trial is warranted when a jury has reached a seriously erroneous result as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias." *E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1066 (6th Cir. 2015) (internal quotation marks and citations omitted).

#### B.

Plaintiff asserts two arguments for a new trial under Rule 59. First, she argues the "jury's allocation-of-fault decision was against the weight of the evidence." ECF No. 194 at

PageID.11765. Second, she argues that she "did not receive an impartial jury," thus a new trial is warranted. *Id.* at PageID.11768. Each argument will be addressed below.

1.

First, the jury's verdict was not contrary to the weight of evidence presented over the eight-day trial. "When a party requests a new trial on the ground that the verdict is against the weight of the evidence, [the Court] will uphold the jury verdict if it is one the jury reasonably could have reached; [the Court] cannot set it aside simply because [it] think[s] another result is more justified." *E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1066 (6th Cir. 2015) (internal quotation marks and citation omitted).

Plaintiff argues that "the jury's allocation-of-fault decision was against the weight of the evidence," and asserts that no reasonable juror could conclude Plaintiff was 80% at fault. ECF No. 194 at PageID.11765. But, as discussed, the jury was presented with Plaintiff's testimony that she was never asked about her donation history and was not warned about the finger prick, as well as evidence that Plaintiff was asked about her donation history and was warned about the finger prick. *See supra* Section II.B.2. They properly considered all the evidence and reached a reasonable conclusion considering everything presented to them over eight days of trial.

Plaintiff's arguments that the jury's verdict was against the weight of the evidence is, "in essence, a request for this Court to reweigh the evidence and to supplant the jury's determination with its own. That is not this Court's role." *Hillman Power Co., LLC v. On-Site Equip. Maint., Inc.*, No. 1:19-CV-11009, 2023 WL 4964362, at *7 (E.D. Mich. Aug. 3, 2023). The jury was presented with all the evidence, properly instructed on the law, and made its decision accordingly. So, the jury's verdict is not against the weight of the evidence.

**2.**

Plaintiff next argues she is entitled to a new trial because she "did not receive an impartial jury." ECF No. 194 at PageID.11768.

The guarantee of an "impartial jury" applies to both civil and criminal cases. *See Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 630 (1991) ("Civil juries, no less than their criminal counterparts, must follow the law and act as impartial factfinders."). A district court abuses its discretion if it fails to strike a juror for cause where that "juror has indicated a refusal to consider the testimony and displayed evidence of a closed mind concerning" the evidence. *United States v. Smith*, 748 F.2d 1091, 1095 (6th Cir. 1984). Courts have long recognized that trial courts, rather than appellate courts, are "better equipped . . . to assess the inflections and nuances presented during a jury *voir dire*." *United States v. Smith*, 748 F.2d 1091, 1095 (6th Cir. 1984) (citing *United States v. Barber*, 668 F.2d 778, 776 (4th Cir. 1982)).

At the outset, this Court notes that most of the legal authority cited by Plaintiff addresses juror bias in the context of a juror's past personal experiences or exposure to pretrial publicity about the case. *See Irvin v. Dowd*, 366 U.S. 717, 725 (1961) (finding "the force of . . . adverse publicity" about defendant accused of multiple murders "fostered a strong prejudice among" jury pool); *Wolfe v. Brigano*, 232 F.3d 499, 502–03 (6th Cir. 2000) (finding abuse of discretion where district judge accepted a juror's assertion of impartiality when the juror had a close relationship with the victim's family and had spoken to the victim's family about the crime); *Hughes v. United States*, 258 F.3d 453 (6th Cir. 2001) (finding the district court erred in not excusing a juror who admitted she did not think she could be fair in light of her personal relationships with police officers and detectives in a case regarding the theft of an officer's firearm and property at gunpoint); *United States v. Smith*, 748 F.2d 1091 (6th Cir. 1984) (affirming district court's finding

that juror's remarks, "as a whole, reveal[ed] no inherent prejudice" where a prospective juror had read a news article about an earlier guilty verdict against the defendant); *United States v. Nelson*, 277 F.3d 164, 201–02 (2d Cir. 2002) (finding the district court abused its discretion by failing to excuse for cause a juror who stated he "didn't know" if he could set aside his personal feelings relating to his knowledge of earlier criminal state proceedings against defendant).

By contrast, the alleged juror bias Plaintiff points to here is three juror's opinions regarding a set of hypothetical facts Plaintiff's Counsel elected to present during *voir dire* focusing on Plaintiff's prior experiences with observing blood. Plaintiff sweepingly asserts that "[a] juror who has formed an opinion cannot be impartial." ECF No. 216 at PageID.12444 (citing *Reynolds v. United States* 98 U.S. 145, 155 (1878)). But Plaintiff's assertion oversimplifies the two "irreconcilable ideals" underpinning the legitimacy of the jury in American courts. Dov Fox, *Neuro-Voir Dire and the Architecture of Bias*, 65 HASTINGS L.J. 999, 1004 (2014). On the one hand, jurors are expected "to maintain an objective point of view, detached from the idiosyncrasies that threaten erratic or specious decisionmaking." *Id.* But, on the other hand, it is precisely the "subjective experiences or attitudes" of jurors that "qualify jurors as laypersons and peers to render a commonsense verdict that takes community norms of fairness into account." *Id.* How can subjective opinions based on adverse hypothetical facts focused on only *one party*, absent any other context or information about the other party, be, in and of itself, *bias*? Indeed, as the Supreme Court in *Reynolds*—the very case Plaintiff relies on—recognized, a juror's expression of an opinion is not always a bias. And it is the court's role "to determine whether the nature and strength of the opinion formed are such as in law necessarily to raise the presumption of partiality." *Reynolds v. United States* 98 U.S. 145, 156 (1878). Here, the opinions solicited from the three jurors challenged by Plaintiff's Counsel did not rise to that level.

Importantly, as Defendant points out, the record does not demonstrate that any of the three jurors at issue—Juror 8, Replacement Juror 6, and Second Replacement Juror 10—expressed a bias that suggested a "refusal" to consider the evidence presented at trial. *United States v. Smith*, 748 F.2d 1091, 1095 (6th Cir. 1984). As discussed below, each juror Plaintiff suggests should have been excused for cause merely expressed their opinions on a set of hypothetical facts presented by Plaintiff's Counsel and did not express that their mind was closed to hearing evidence in the case.

### i. Juror 8

Juror 8 was the only impaneled juror Plaintiff sought to remove for cause at trial. *See* ECF No. 211 (sealed) at PageID.12270.

During *voir dire*, Plaintiff's Counsel asked the "whole panel" if any of them felt "that if somebody has this tendency, that they don't like blood, they don't like needles, they get lightheaded, they pass out, they feel dizzy, they have vertigo, that they should never try to donate either blood or plasma? Any of you feel that way?" *Id.* at PageID.12244. Four prospective jurors expressed opinions on the hypothetical situation presented by Plaintiff's Counsel, and then Juror 8 expressed the opinion that she *personally* "wouldn't have the tendency to donate blood or plasma if [she] [knew] that [she] will pass out from the sight." *Id.* at PageID.12247. She also noted that she "would not recommend" donating plasma if someone knows they pass out at the sight of blood, and questioned why someone would "put [themselves] through that." *Id.* Later on, she stated that she used to draw blood at her place of employment, and that if someone told her they were "squeamish" about the process, she would have them "lie down" instead of sitting in a chair. *Id.* at PageID.12248. Eventually, Plaintiff's Counsel addressed Juror 8 directly:

> **Plaintiff's Counsel:** [Juror 8], as a medical assistant for 30 years or so, if the– part of what Judge Ludington will tell the jurors that you can use common sense, you can, you know, refer back to your own experiences of life, but you– evidence that you decide the case on is based upon what you hear or see in this courtroom. Would

> you be able to do that as opposed to looking at, well, this is the way we do it at my place versus the evidence that you hear in this courtroom as to how it should be done, how it was done?
>
> **Juror 8:** I mean, it's hard to say without knowing more details. I mean, I would rely mostly on the fact that you should use common sense.

ECF No. 211 (sealed) at PageID.12265.

This does not reflect an unwillingness to listen to the evidence.[6] To the contrary, Juror 8's statement reflects a willingness to make her decision based on *specific details* of the case, and use "common sense" to analyze those details. This is precisely what a juror is instructed to do. In sum, Juror 8 did not articulate an opinion so strong as to infer she was biased, and she did not articulate an unwillingness to listen to the evidence and consider the facts of the case before making a decision.

### ii. Replacement Juror 6

Plaintiff next argues Replacement Juror 6 was biased. Importantly, Plaintiff did not request to remove Replacement Juror 6 for cause. *See generally* ECF No. 211 (sealed). But, even if she had, Replacement Juror 6 did not express an opinion so strong as to conclude she was biased.

Replacement Juror 6 was seated in the jury box after the original Juror 6 was excused. *See id.* at PageID.12272–73. When this Court asked Replacement Juror 6 if she would have responded to any of the questions or had any observations as to any of the discussions" during *voir dire*,

---

[6] Notably, at the very end of Plaintiff's Counsel's *voir dire*, he asked if it would change any of the jurors "opinions" if, in evidence, they hear that "a BioLife person was supposed to ask about that very phenomenon before the finger poke? Would that change any of your opinions with respect to whether [Plaintiff] [s]hould have walked in that door or not?" ECF No. 211 (sealed) at PageID.12269. Two jurors responded no. *Id.* at PageID.12269–70. Plaintiff's Counsel then further solicited answers by asking "anyone?" *Id.* at PageID.12270. Juror 8 shook her head. *Id.* Importantly, it was this Court's impression at trial that Juror 8's "shaking head" was in response to Plaintiff's Counsel's further inquiry as to whether "anyone" else wanted to answer, *not* in response to Plaintiff's Counsel's question about the change of opinion.

Replacement Juror 6 responded that "[j]ust knowing that if I had that condition of passing out, I would probably take it upon myself to let them know because humans are flawed, so." *Id.* at PageID.12273. During questioning by Plaintiff's Counsel, Replacement Juror 6 noted her daughter donated plasma in the past. *Id.* at PageID.12280–81. Following this comment, Plaintiff's Counsel and Replacement Juror 6 had the following exchange:

> **Plaintiff's Counsel:** Do you have a thought that [Plaintiff] should have never gone through that door and [you] won't be able to get over that regardless of whatever evidence is put in?
>
> **Juror 6:** I think she should have made it well known. If someone even asked, she needed to take the proper attendance for herself.
>
> **Plaintiff's Counsel:** Okay, so its okay for her to go in, but you think she just needed to make sure they knew?
>
> **Juror 8:** Uh-huh.

ECF No. 211 (sealed) at PageID.12281.

Again, none of Replacement Juror 6's statements suggest an opinion so strong as to suggest bias, nor do any of her statements suggest an unwillingness to listen to the evidence and decide the case based on the facts presented to her.

### iii. Second Replacement Juror 10

Again, Plaintiff did not request to remove Second Replacement Juror 10 for cause. *See generally* ECF No. 211 (sealed). But, even if she had, Second Replacement Juror 10 did not express an opinion so strong as to conclude he was biased, nor did he express an unwillingness to consider the evidence.

Second Replacement Juror 10 was seated in the jury box after the first replacement for Seat 10 was excused. *See id.* at PageID.12283. The Court asked Second Replacement Juror 10 if he would have responded to any questions that he had heard so far or had any opinions on any of the

subjects that had been discussed during *voir dire*. *Id.* at PageID.12284. Second Replacement Juror 10 responded, "I believe I have no biases." *Id.* This Court asked Second Replacement Juror 10 specifically if he would have responded to any of the questions, and Second Replacement Juror 10 stated that he "follow[ed] some of the jurors in questioning the person going in to give plasma, knowing that they have the condition, to tell the person of whatever they're doing that they do have that condition." *Id.* Later, when questioned by Plaintiff's Counsel, Second Replacement Juror 10 clarified his opinion:

> I'm not saying she should not have gone in. I would have taken the responsibility of telling people I have this condition, because if you give plasma or give blood, you work with many different people and not every person's going to know your personal history as you go through the chain. And basically, if it was important to me, I'd make sure that person knows that I have that condition.

ECF No. 211 (sealed) at PageID.12285.

Plaintiff's Counsel responded by asking if it would change his mind that Plaintiff thought BioLife would ask about her medical history, and Second Replacement Juror 10 responded that "they need to do the proper screening of people that are donating, whether its plasma or blood." *Id.*

Like Juror 8 and Replacement Juror 6, none of Second Replacement Juror 10's statements suggest he held an opinion so strong as to warrant bias. Nor do his statements reflect that his mind was closed to hearing the evidence throughout trial and deciding the case based on this evidence.

In sum, Jurors 8, Replacement Juror 6, and Second Replacement Juror 10, all of whom were impaneled, did not exhibit an opinion so strong that it required their removal for cause. Thus, Plaintiff is not entitled to a new trial under Civil Rule 59 under this theory.

## IV.

Accordingly, it is **ORDERED** that Plaintiff's Motion for Judgment as a Matter of Law and for a New Trial, ECF No. 194, is **DENIED**.

**This is a final order**.

Dated: March 28, 2024                            s/Thomas L. Ludington
                                                                         THOMAS L. LUDINGTON
                                                                         United States District Judge